# United States Court of Appeals
## For the First Circuit

No. 04-2120
No. 04-2121

FONTEN CORP.; BELMANN CORPORATION,

Plaintiffs, Appellants,

v.

OCEAN SPRAY CRANBERRIES, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

Lawrence R. Ehrhard, with whom Rose A. McGuirrin was on brief, for appellant.
Cynthia D. Vreeland, with whom Brett R. Budzinski and Wilmer Cutler Pickering Hale and Dorr LLP were on brief, for appellee.

November 17, 2006

**STAHL**, <u>**Senior Circuit Judge**</u>.  Fonten Corp. and Belmann Corp. appeal from a jury verdict and the district court's denial of its motion for a new trial in their suit against Ocean Spray Cranberries, Inc. ("Ocean Spray"), for a claimed violation of a settlement agreement.  On appeal, plaintiffs argue that the participation and conduct of Ocean Spray's trial attorney prejudiced the jury, and that the verdict was against the clear weight of the evidence.  We affirm.

## I. Background

Fonten Corp. and Belmann Corp. were engaged in the business of marketing fruit juice in Taiwan.  Fonten, a California corporation, purchased the juice in the United States and shipped it to Taiwan where Belmann, a Taiwanese corporation, distributed it; both corporations were controlled by Hong Chen ("Chen"), a Taiwanese citizen.  In 1994, Ocean Spray, a cooperative of cranberry and grapefruit growers headquartered in Lakeville, Massachusetts, began to market its fruit juices in Taiwan, advertising their products using a Chinese phrase that translates roughly as "100% natural fruit juices."[1]  Chen took exception to this phrase, interpreting it to mean that Ocean Spray was advertising its products as 100% <u>juice</u>, when some of the products were in fact of the "cocktail" variety--a mixture of juice and sugar water. Ocean Spray disputed that interpretation, saying that

---

[1]The precise translation is not material here.

it was advertising its products only as 100% <u>natural</u>, and it refused to change its advertisements. Three years after the advertisements ran, plaintiffs brought an action in federal court in the District of Massachusetts for false advertising and related claims.

The parties eventually entered into a settlement agreement, in which Ocean Spray agreed to pay Chen $100,000 and to publish a series of corrective advertisements in Taiwanese newspapers, but did not admit to having falsely advertised its products. Ocean Spray was represented in the settlement negotiations by Attorney Cynthia D. Vreeland. Following the agreement, certain corrective advertisements ran in selected newspapers in April of 1999. Because of a quirk in Taiwanese newspaper advertising, some of the advertisements ran in only half of a given newspaper's circulation. Some of Taiwan's newspapers follow a practice of allowing an advertiser to purchase space in only half of a day's circulation. These two "single editions"[2] are then shuffled together so that each edition is distributed roughly equally around the area.

Chen closed his fruit juice businesses in 1999 and sued Ocean Spray in Massachusetts state court in late 1999 for breach of

---

[2]The parties use different terms to describe such editions including "half" and "full" editions, "single" and "double" editions, and "A or B" and "A plus B" editions. For the sake of clarity, we will refer to them as "single" and "double" editions.

the settlement agreement. Because the parties had consented to federal jurisdiction, the state court dismissed the action. On February 14, 2003, plaintiffs brought the same breach of contract suit in U.S. District Court under diversity jurisdiction. At trial, Ocean Spray was again represented by Attorney Cynthia Vreeland, and it is her participation that is at issue here. Shortly before trial, plaintiffs moved to have Vreeland disqualified under Massachusetts Rule of Professional Conduct 3.7(a) ("Rule 3.7")[3] because she "ought to be called as [a] witness[]" since she was a part of the negotiations at issue. The motion was denied and trial proceeded without Vreeland being called to testify. At the close of the trial, the jury returned a verdict for Ocean Spray. Plaintiffs moved for a new trial, which the district court denied. Plaintiffs now appeal both the verdict and the denial of their motion for a new trial. They argue on appeal that the district court erred in not ordering a new trial because of the conduct of Attorney Vreeland and because the verdict was against the weight of the evidence.

---

[3]"(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
    (1) the testimony relates to an uncontested issue;
    (2) the testimony relates to the nature and value of legal services rendered in the case; or
    (3) disqualification of the lawyer would work substantial hardship on the client."

## II. Discussion

### A. Attorney Conduct

Plaintiffs argue that the district court should have granted the new trial motion because Vreeland had engaged in prejudicial misconduct during the course of the trial, and because Vreeland's mere presence lent undue weight to the testimony of Ocean Spray's witnesses, making it impossible for plaintiffs to have a fair trial (the so-called "unsworn witness" problem).[4]

As to Attorney Vreeland's trial conduct, plaintiffs point only to the following exchange in which Vreeland cross-examined plaintiffs' expert on his use of an industry-wide return-on-equity estimate to calculate damages, rather than one based just on Taiwanese juice businesses:

> Q.   In your conversations with Mr. Ehrhard and Mr. Cheng [counsel for plaintiffs], did they tell you that Daisy Hong from Ocean Spray had collected audited public financial statements from nine companies that actually sell fruit juice products in Taiwan?
>
> A.   I did not make use of that report.
>
> Q.  Did you know that, did you know that your lawyers had that report?

---

[4]Plaintiffs do not appeal the denial of their motion to disqualify Vreeland as a necessary witness under Rule 3.7, and therefore we do not review that denial. Although they never cite to Rule 3.7 in their allegations of misconduct at trial, they make several comments which allude to the concerns Rule 3.7 addresses. However, even if violation of Rule 3.7 was at issue, they make no argument here that Vreeland was a "necessary" witness--indeed, she was never called as a witness. Therefore, we do not consider Rule 3.7 in reviewing Vreeland's conduct at trial.

A.  I'm not aware of that.

...

Q.  Did you or did you not know that Mr. Chen's lawyers had public audited financial statements from nine companies selling fruit juice products in Taiwan?

A.  I did not know that.

Q.  They didn't tell you that?

A.  No.

Plaintiffs did not contemporaneously object to the questioning, but did raise the issue at the close of trial and again in their motion for a new trial following the jury verdict.  Their objection was based on the fact that the financial reports Vreeland referenced were not in evidence.  The district court ruled that the line of questioning was proper.

"Absent an abuse of discretion, this Court defers to a district court's denial of a motion for a new trial based upon improper argument or conduct of counsel." S.E.C. v. Happ, 392 F.3d 12, 26-27 (1st Cir. 2004).  Defendants argue that plaintiffs' failure to timely object waives the issue.  Failure to timely object to an attorney's misconduct will frequently result in the denial of a motion for new trial, but such denials typically occur in cases where a party did not raise the objection at all until after the jury had returned a verdict.  See, e.g., Computer Sys. Eng'g, Inc. v. Quantel Corp., 740 F.2d 59, 69 (1st Cir. 1984).  The concern in those cases is that a party might hold back its

objections until after it sees the verdict.  See id.; Wildman v. Lerner Stores Corp., 771 F.2d 605, 610 (1st Cir. 1985) ("Counsel cannot play a waiting game and after an adverse verdict is rendered raise an objection to argument for the first time.").  Here, such gaming is not a concern, since plaintiffs first brought their concerns to the attention of the district judge prior to the jury verdict.  See Happ, 392 F.3d at 26-27 (applying an abuse of discretion standard where attorney failed to immediately object to closing arguments, but did object before the jury began deliberations).  Furthermore, even if the objection were not preserved, we would still review for plain error in order to correct substantial injustice.  See United States v. Olano, 507 U.S. 725, 732-35 (1993); Smith v. Kmart Corp., 177 F.3d 19, 25 (1st Cir. 1999) (failure to object to improper closing argument forfeits, but does not waive, the issue, and plain error review still applies); see also Computer Sys. Eng'g, 740 F.2d at 69-70.

Admittedly, the reasons for allowing a delayed objection to an attorney's conduct during closing argument are different from those for allowing a delayed objection to an attorney's conduct during witness questioning.  See Wilson v. Town of Mendon, 294 F.3d 1, 16 n.30 (1st Cir. 2002) ("We are loath to impose a rule that would require counsel to abandon professionalism and decorum by routinely interrupting the other side's closing argument to avoid the risk of waiving an objection entirely.").  However, because it

-7-

does not affect the outcome of this case, we need not decide the issue here. Instead, we will follow the practice we have adopted in the closing-argument cases of assuming, _arguendo_, that the objection was preserved. _See_ _United States_ v. _Potter_, 463 F.3d 9, 23-24 (1st Cir. 2006); _United States_ v. _Laboy-Delgado_, 84 F.3d 22, 31 n.7 (1st Cir. 1996). Nonetheless, because we award a high degree of deference to a district judge's management of attorney conduct, a showing of prejudice is still required before we will reverse for an abuse of discretion. _See_ _Happ_, 392 F.3d at 27 (reversal of an order denying a new trial on the basis of attorney misconduct requires "a showing of prejudice"); _P.R. Aqueduct & Sewer Auth._ v. _Constructora Lluch, Inc._, 169 F.3d 68, 82 (1st Cir. 1999) ("We reverse only upon a showing of prejudice.").

The district judge ruled that Vreeland's questioning had not been improper, and that she was permitted to use her knowledge of the case in asking leading questions. Plaintiffs are not specific as to why such questioning would be improper, much less why it would rise to the level of misconduct such as would leave the district judge no option but to order a new trial. They say only that Vreeland was "testifying" through these questions. However, all that we can see that she was "testifying" to was the existence of certain documents, and that they were in the possession of plaintiffs' counsel; she made no reference to any facts contained in the documents, or whether the documents

-8-

contradicted the expert's testimony. In addition, even assuming such questioning was improper, it was not prejudicial. The questioning went only to the amount of, not liability for, damages, and that was a question that the jury did not reach. This is hardly "play[ing] fast and loose with the judicial system" such as would warrant a new trial. Polansky v. CNA Ins. Co., 852 F.2d 626, 632 (1st Cir. 1988) (internal quotation marks omitted).

Plaintiffs next argue that Vreeland's mere presence at the trial lent Ocean Spray's view of the settlement negotiations an added air of veracity that was prejudicial to them. They argue that, because the jury knew that she had been part of the settlement negotiations, her advocacy for Ocean Spray carried added weight. Here, they rely on the so-called "unsworn witness rule."

The contours of the unsworn witness rule--if it can be called a rule--are unclear, and the parties provide little authority to guide us. In some cases, it is treated as coextensive with an applicable ethical rule such as Rule 3.7; that is, disqualification will be appropriate only where an attorney is likely to be called as a necessary witness. See, e.g., United States v. Anderson, 319 F.3d 1218, 1221-22 (10th Cir. 2003). This is the approach for which the defendant appears to argue, that any unsworn witness problems be addressed through application of Rule

3.7.[5] Plaintiffs, however, urge that we follow the more expansive rule operating in the Second Circuit. There, the unsworn witness rule addresses situations where "the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination" regardless of whether he is a necessary witness. United States v. Locascio, 6 F.3d 924, 933 (2d Cir. 1993). The Second Circuit rule operates almost exclusively in criminal cases, where, typically, the attorney was present at the criminal act in question. Plaintiffs have found only one (unreported) civil case discussing the rule. See Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 2000 WL 1655054, at *5-6 (S.D.N.Y. Nov. 3, 2000) (denying request to disqualify attorney).

This circuit has rarely been called upon to address this problem, and we have not held whether there is any unsworn witness rule that goes beyond Rule 3.7. See U.S. v. Diozzi, 807 F.2d 10, 14-15 (1st Cir. 1986) (expressing skepticism that attorneys with first-hand knowledge would have an unfair advantage with a jury). We decline now to decide whether to adopt any such rule, since, even if we did, plaintiffs' claim would still fail. Even under the expansive Second Circuit rule, attorney disqualification is a "drastic remedy," reserved for cases where the attorney has

---

[5]As already noted, there is no claim that Vreeland was a necessary witness such as would trigger Rule 3.7. See supra, n.4.

"entangled himself to an extraordinary degree" with his client. Locascio, 6 F.3d at 934. See Bristol-Myers, 2000 WL 1655054, at *5. Overturning a verdict or ordering a new trial based on an unsworn witness issue is at least as drastic.

Here, the district judge was aware of the risks that accompanied Vreeland's participation and warned her not to imply that any witness's version of events was inaccurate. The district judge ably ensured that Vreeland did not cross any lines, and plaintiffs are unable to point to any specific instances where her presence or questioning may have prejudiced the jury. The one colloquy with plaintiff's expert, discussed supra, does not qualify, even if it were improper, since it concerns information that Vreeland gathered in her capacity as trial counsel, not as counsel to Ocean Spray during the initial settlement negotiations. Importantly, even if Vreeland had been disqualified, her replacement would have had identical access to that information, and there would have been the same risk of its use at trial.

Without other specific examples, plaintiffs instead claim that it was simply Attorney Vreeland's presence as counsel at trial that prejudiced the jury against the plaintiffs. This is not enough to establish abuse of discretion, for it would force, contrary to the district court's determination as to potential prejudice, the disqualification from trial of any attorney who had represented a client in pre-trial settlement negotiations. See

Diozzi, 807 F.2d at 14 (declining to disqualify counsel "merely for having represented their clients in a preindictment investigation").

## B.  Weight of the Evidence

"A verdict may be set aside and new trial ordered when the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice." Ahern v. Scholz, 85 F.3d 774, 780 (1st Cir. 1996) (internal quotation marks omitted).  Plaintiffs argue that the jury verdict was against the clear weight of the evidence, because all parties were operating under the assumption that the corrective advertisements would run in all of a newspaper's circulation, rather than only half.  Their argument essentially is that, because Chen knew of the single and double editions and had an intent for the advertisements to appear in the double editions, and because Ocean Spray's representatives at the settlement negotiation did not even know that there was a single-edition option, there is no way that the settlement agreement could be interpreted to allow for anything other than double-edition publication.

Whatever the merit of plaintiffs' argument, they presented it to the jury, and it decided otherwise.  The issue centers around the meaning of the word "publish."  The settlement agreement went into detail regarding the size, wording, timing, and

-12-

other features of the advertisements, but said nothing about single- or double-edition publication; it said only that "Ocean Spray shall, at its expense, publish the statement . . . in each of the three newspapers listed in Exhibit D." Ocean Spray presented evidence that the typical practice in Taiwan for newspapers with single and double editions is to purchase advertising space only in the single edition. Plaintiffs' media buyer expert testified that, although he would have recommended purchasing double-edition advertisements in this instance, 75% of his clients purchased single-edition advertisements. Ocean Spray's country manager testified that she had previously purchased only single-edition advertisements for Ocean Spray. Ocean Spray also pointed to the language in the settlement agreement calling for publication "at the usual publication rates," and it presented evidence that the newspapers' advertising price lists treated the single-edition price as the "usual rate."

To counter this, plaintiffs argue that informing as many consumers as possible was important to Chen. We do not dispute that it was, but that is not sufficient to sustain an argument that no reasonable jury could have believed that publishing in single-edition newspapers satisfied the contract, particularly when there is no extrinsic evidence that Chen actually intended double-edition publication. Nor is it enough to argue that Ken Rosenberger, Ocean Spray's general manager for the Asia-Pacific region, who

represented Ocean Spray in the settlement agreement, did not know that single-edition publication was possible. A reasonable jury could have found that Rosenberger, who managed Ocean Spray's operations in several different countries, could have intended "publish" to mean "publish according to local practices." The district judge gave the jury a proper instruction on the ambiguities in the contract, and the jury was entitled to return the verdict it did.

### III. Conclusion

Because the district court did not commit error in its rulings, the judgement of the district court and its denial of plaintiffs' motion for a new trial are **affirmed**.