FILED
United States Court of Appeals
Tenth Circuit

October 19, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

  Plaintiff - Appellee,

v.

DENNIS B. EVANSON,

  Defendant - Appellant.

No. 08-4164

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:05-CR-00805-TC-1)**

Rodney R. Parker (Max D. Wheeler and Sam Harkness, with him on the briefs), of Snow, Christensen & Martineau, Salt Lake City, Utah, for Defendant - Appellant.

Jennifer Levin Eichhorn, Attorney, Tax Division, (John A. DiCicco, Acting Assistant Attorney General; Alan Hechtkopf, Karen Quesnel, Gregory Victor Davis, Attorneys, Tax Division, with her on the brief) United States Department of Justice, Washington, D.C., for Plaintiff - Appellee.

Before **BRISCOE**, **McKAY**, and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

  Dennis B. Evanson appeals from his conviction in the United States District

Court for the District of Utah on counts of conspiracy to commit tax fraud, tax

evasion, and aiding and assisting in the preparation of false income-tax returns.

Before Mr. Evanson's trial the court disqualified his retained counsel. His sole

contention on appeal is that the disqualification deprived him of his right to

counsel under the Sixth Amendment. Exercising jurisdiction under 28 U.S.C.

§ 1291, we affirm. The district court reasonably assessed the problems that could

arise from counsel's continued representation of Mr. Evanson.

## I.     BACKGROUND

The indictment alleged that Mr. Evanson, who was an attorney licensed in

Colorado, and five codefendants operated a scheme to enable participants to cheat

the government out of income-tax revenue. Participants paid a $19,700 base fee

and a percentage of their tax savings. In exchange, the defendants manufactured

fictitious transactions to conceal income and create apparent deductions. To carry

out the scheme the defendants used a number of business entities that they

controlled (which we will call "Evanson companies"). For example, a participant

could acquire phony insurance policies. The participant would then pay

"premiums" on that policy to an Evanson company and report those payments as a

deduction on his business or personal income-tax return. The defendants credited

the amount of the payments (less their fee) to an account that they maintained for

the participant. Similarly, participants could obtain phony documents showing

losses "from currency futures, options, or forward contracts." Aplt. App., Vol. I

at 106–07 (Indictment). To obtain these documents, a participant either paid cash

or signed a promissory note to become a partner in an Evanson company. If the participant paid cash, his payment, less the defendants' fee, was credited to his account. If he signed a promissory note, he was under no obligation to make payments on the underlying loan; on the contrary, if a participant made a "loan payment," the amount was credited to his account and, as a bonus, frequently reported as a home-mortgage-interest deduction.

To access funds from their accounts, participants engaged in additional contrivances with the aid of the defendants. Most commonly, funds were returned through "loans" provided by Cottonwood Financial, an Evanson company. Because the "borrowed" money actually belonged to the participants—that is, the "borrowers"—there was no expectation that these fictitious loans be repaid. The defendants also enabled a participant to acquire property with the funds in his account by purchasing the property in the name of a nominee. For example, a participant who wanted to withdraw $250,000 from his account could instruct the defendants to purchase a $250,000 piece of real property in the name of an Evanson company. Although ostensibly belonging to the company, the property would be under the "sole dominion and control" of the participant. *Id.* at 111.

Ten months after the indictment was filed, the government moved the district court to disqualify Mr. Evanson's counsel, Max Wheeler, because of an alleged conflict of interest. The motion asserted that Mr. Wheeler was involved in, or had intimate knowledge of, efforts by "Evanson and others . . . to create

false documents attempting to substantiate fictitious transactions" and to induce participants to sign misleading documents or give other exculpating evidence. *Id.* at 165. The government contended that Mr. Wheeler would therefore need to testify at Mr. Evanson's trial.

In support, the government relied on three documents. The first was a letter written by Mr. Evanson after participants who had learned of the federal investigation attempted to get their money back from the defendants. The letter, dated May 13, 2005, responded to a participant whose attorney had written Mr. Wheeler to request that Compass Point Investment LLC, an Evanson company, quitclaim certain real property to him. The property was owned by the participant but held in the name of Compass Point. Mr. Evanson wrote the participant a letter rejecting the request. It began as follows:

> My counsel, Mr. Max Wheeler, has received requests from your attorney that certain property be quitclaimed to you in your efforts to close out any interest you may have in International Capital Group Inc. [an Evanson company]. We have reviewed the matter, and he suggested I confer with you directly on the issue.

*Id.* at 202. The remainder of the letter characterized the arrangement with the participant as an investment fund and the property in question as an asset of the company purchased with loans from the fund. The best way to acquire the property, the letter explained, was for the participant to pay off loans that he had with Evanson companies and buy the property outright. Although other options might be available, explained the letter, none relieved the participant of his duty

-4-

to service outstanding loans.  Mr. Evanson stressed that point, stating, "I have told you in the past, even from the very beginning, that any loans provided to you were, and always must be treated as real financial relationships creating real obligations of repayment to your lender."  *Id.* at 202.

In the government's view, this letter would help satisfy its burden of proving Mr. Evanson's willfulness because the letter evinces a cover-up and, presumably, shows that he knew that the scheme as it had previously operated was unlawful.   The government therefore planned to seek admission at trial of the letter and evidence of surrounding events.  This strategy, however, implicated Mr. Wheeler, who was referenced in the letter's opening paragraph.  The government stated:  "Inasmuch as Mr. Wheeler advised his client, he possesses first-hand knowledge of Evanson's knowledge and intent prior to sending out the letter.  Consequently, Mr. Wheeler's advice to Evanson will be a material fact in the present criminal trial.  Mr. Wheeler will be a necessary witness."  *Id.* at 168.

The second document relied upon by the government was another letter sent by Mr. Evanson to a participant in the scheme.  Dated February 13, 2006, with a return address for Fishpaw Currency Group LC, an Evanson company, the letter explained that under a new tax-filing requirement, Fishpaw would be obliged to "treat certain non-performing loans as having been effectively forgiven."  Aplee. Supp. App. at 233.  If a loan is designated "'forgiven,'" the letter continued, the company must "file a 1099-C in the name of the borrower in the amount of the

outstanding loan, thus requiring the borrower to include the amount of the unpaid 'forgiven' loan in their taxable income." *Id*. The letter instructed the participant that to avoid this adverse tax event, he would need to "review [his] loan obligations with the company and ensure that required payments are being made in accordance with their terms." *Id.*

The government argued that this attempt to treat the "loans" as creating genuine financial obligations—contrary to the original scheme, which contemplated no true repayment—provided further evidence of Mr. Evanson's willfulness. And, again, it cited evidence of Mr. Wheeler's involvement: Brent Metcalf, a codefendant, had sent an identical letter to a different participant in the scheme. During plea negotiations with Metcalf's attorney, the government stated that it viewed the letter as an act of obstruction and threatened to withdraw from negotiations and file fresh charges. To persuade the government against that course of action, Metcalf's counsel explained that it was his understanding, based on conversations with his client, that Mr. Wheeler had reviewed the letter before it was sent.

The third document cited by the government in its disqualification motion was an email that Mr. Evanson had sent to a participant on February 2, 2006, and copied to Mr. Wheeler. The email quoted from the government's indictment in an effort to assure the participant that guarantee members of Cayman Island corporations (which included some Evanson companies) need not pay "'taxes on

income earned by said corporation.'" Aplt. App., Vol. I at 197. According to the government, this email aimed to mislead the participant "into believing that Evanson's fraud scheme was endorsed by the United States and [the email] was designed to cause him to alter his interactions with the IRS in a way that was beneficial to Evanson's defense." *Id.* at 168. The government stated that because Mr. Wheeler was copied on this email, it was sent with his "knowledge and perhaps approval," which further illustrated his status as a potential trial witness. *Id*. at 169.

In a written order the magistrate judge denied the government's disqualification motion, reasoning that the attorney-client privilege would severely restrict the testimony that Mr. Wheeler could provide if called as a witness. The magistrate judge also cited a concern that "[i]f counsel who assist clients in investigative stages are to be disqualified in trial stages, defendants will be substantially restricted in their choice of counsel" and discouraged from seeking legal advice during an investigation. *Id.*, Vol. II at 236.

The government appealed the magistrate judge's ruling to the district court, which ordered additional briefing and held two hearings on the matter. At the second hearing the district court reversed the magistrate judge and disqualified Mr. Wheeler. The court ruled that the three documents described above would likely be admissible at trial. This, the court explained, generated "many scenarios" in which Mr. Wheeler "could and well might be called as a witness."

*Id.* at 394–95. Mr. Wheeler could potentially serve as a defense witness, testifying that the documents in question were created in accordance with his advice. Or if Mr. Evanson were to testify that Mr. Wheeler "gave his stamp of approval," the government could call Mr. Wheeler as a rebuttal witness. *Id.* at 395. Moreover, the court noted, codefendant Metcalf (whose counsel had previously claimed that Wheeler reviewed the 2006 letter) might attempt to call Mr. Wheeler as a witness.

In a brief written order filed after the hearing, the district court stated its finding that "[t]he possibility of Mr. Wheeler testifying as a government or defense witness is real, and a serious potential for conflict arises from that possibility." *Id.* at 301 (citing *Wheat v. United States*, 486 U.S. 153 (1988)). It also found that "there [was] a strong possibility that Mr. Wheeler would be an unsworn witness." *Id.* In support of this finding, the court cited *United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993), which explains that "[a]n attorney acts as an unsworn witness when his relationship to his client results in his having first-hand knowledge of the events presented at trial," enabling the attorney to "subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross-examination," *id.* at 933. In a later order the court disqualified Mr. Wheeler's entire law firm.

After the district court disqualified Mr. Evanson's chosen counsel, four of his five codefendants pleaded guilty. Only Mr. Evanson, represented by new

counsel, and codefendant Wayne DeMeester were tried. The jury found DeMeester not guilty on all counts. As for Mr. Evanson, the jury returned a verdict of guilty on counts of conspiracy, tax evasion, and aiding and assisting in the preparation of false income-tax returns. The district court sentenced Mr. Evanson to 120 months' imprisonment. It also ordered him to forfeit property and to pay a penalty assessment, restitution of $1,324,128.00, and a money judgment of $2,774,133.04 to the United States. On appeal Mr. Evanson does not allege any error in his trial or sentence. Nor does he contend that the disqualification of Mr. Wheeler's law firm was improper. He claims only that the pretrial disqualification of Mr. Wheeler violated the Sixth Amendment.

## II.    DISCUSSION

We begin by reviewing the law governing disqualification of criminal-defense counsel, focusing on Mr. Evanson's contentions regarding the controlling standards and the scope of appellate review. We then turn to the merits of this specific appeal.

### A.    Legal Framework

The "essential aim" of the Sixth Amendment "is to guarantee an effective advocate for each criminal defendant." *Wheat*, 486 U.S. at 159. Nevertheless, the Amendment does not "ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.* The trial courts must pursue "an independent interest in ensuring that criminal trials are conducted within the

ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160.  For example, a criminal defendant does not enjoy an absolute right to be represented by an attorney laboring under a conflict of interest.  *See id.* at 162–63.  Even when a defendant seeks to proceed with conflicted counsel by waiving the conflict, a district court retains authority to reject the proffered waiver to preserve ethical standards and ensure a fair trial. *See id.* at 160, 163.

Mr. Evanson acknowledges that Mr. Wheeler could have been disqualified if he actually had a conflict of interest.  He insists, however, that there was no disqualifying conflict.  He relies on Utah Rule of Professional Conduct 3.7, which has been adopted by the United States District Court for the District of Utah.  *See* D. Utah Civ. R. 83-1.1(g).  Rule 3.7, he notes, does not prohibit a lawyer from "act[ing] as advocate at a trial" unless he "is likely to be a necessary witness." Utah R. Prof'l Conduct 3.7(a).[1]  Mr. Evanson complains that the district court

---

[1] Utah Rule of Professional Conduct 3.7 states:

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

(a)(1) the testimony relates to an uncontested issue;

(a)(2) the testimony relates to the nature and value of legal services rendered in the case; or

(a)(3) disqualification of the lawyer would work substantial hardship on the client.

(continued...)

-10-

never found the requisite likelihood that Mr. Wheeler would be a witness.

This argument fails on at least two counts. First, counsel can be disqualified for reasons other than a conflict of interest. *See, e.g., United States v. Collins*, 920 F.2d 619, 627 (10th Cir. 1990) ("[A]n attorney may be dismissed for pursuing frivolous theories."). Pertinent here is the so-called "unsworn witness problem," which can warrant disqualification. *Locascio*, 6 F.3d at 934. The problem arises when an attorney was a participant in events to be explored at trial. *See id.* at 933. In that circumstance the attorney might convey "first-hand knowledge of the events without having to swear an oath or be subject to cross examination." *Id.* at 933. An attorney providing "unsworn testimony" is not at odds with his client—there is no conflict of interest. *See id*. at 933–34. Rather, "the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the factfinding process is impaired." *Id*. at 934.

Second, the standard to determine whether a conflict of interest warrants disqualification is not set by Rule 3.7. To begin with, there are conflicts of interest not covered by the rule. For instance, "[e]ven if the attorney is not called" as a witness, he "may be constrained from making certain arguments on behalf of his client because of his own involvement, or may be tempted to

---

[1](...continued)
(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

minimize his own conduct at the expense of his client." *Id.* at 933. In addition, Rule 3.7 cannot supplant constitutional standards. Even if a specific conflict of interest is addressed by a rule of professional conduct, such a rule cannot define the scope of a defendant's Sixth Amendment rights. True, rules of professional conduct are relevant in the sense that a court's authority to disqualify counsel stems in part from its interest in "ensuring that criminal trials are conducted within the ethical standards of the profession." *Wheat*, 486 U.S. at 160. But it does not follow that the Sixth Amendment requires courts to identify a strict violation of an applicable ethical rule before disqualifying counsel. *See id.* (recognizing courts' interest in "ensuring that . . . legal proceedings appear fair to all who observe them"). Mr. Evanson has cited no authority supporting such a view, nor, as we shall see, can it be squared with *Wheat*, the leading case in this area. Thus, the district court was not bound by the requirement in Rule 3.7 that testimony by Mr. Wheeler be "likely."

In *Wheat*, attorney Eugene Iredale sought to represent defendant Mark Wheat on charges relating to a drug-distribution conspiracy after Iredale had represented two other participants in the conspiracy—Juvenal Gomez-Barajas and Javier Bravo. *See id.* at 155. Although Gomez-Barajas and Bravo had pleaded guilty (to drug or other charges) before Wheat's scheduled trial, the district court nonetheless denied Iredale's attempt to substitute as Wheat's trial counsel. *See id.* The Supreme Court affirmed, announcing that while the Sixth Amendment

-12-

requires that district courts "recognize a presumption in favor of [defendant's] counsel of choice, . . . that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Id*. at 164.

Without identifying a technical violation of applicable rules of professional conduct, the Court described two possibilities that, in its view, created a sufficiently serious potential for conflict. *See id.* at 155–56, 163–64. First, the district court had yet to accept Gomez-Barajas's guilty plea, and if the court happened to reject his plea, Gomez-Barajas could stand trial. *See id*. at 155, 164. In that event, Wheat might be called upon to testify against Gomez-Barajas, and Iredale would be prevented from vigorously cross-examining Wheat, thus ineffectively representing Gomez-Barajas. *See id*. at 156, 164. Second, Bravo had pleaded guilty to delivering 2,400 pounds of marijuana to a Los Angeles residence. *See id.* at 155. The government believed that a portion of this marijuana had ultimately been transferred to Wheat and, accordingly, requested that Bravo be made available as a witness to testify at Wheat's trial. *See id*. at 156. The Court reasoned that if the government called Bravo as a witness (which it ultimately did), Iredale would not be able to conduct a "vigorous cross-examination" and would thereby provide ineffective assistance to Wheat. *Id*. at 164 & n.4.

-13-

As the four *Wheat* dissenters observed, the emergence of these conflicts was far from certain. *See id.* at 169–71 (Marshall, J., dissenting); *id.* at 172 (Stevens, J., dissenting) (concurring in Justice Marshall's analysis). Any problem arising from Iredale's representation of Gomez-Barajas was predicated on the district court's rejecting Gomez-Barajas's guilty plea, an unlikely event. *See id.* at 169 (Marshall, J., dissenting). As for Bravo, even though he was likely to provide testimony regarding a shipment of marijuana, there was little reason to think that he would provide *disputed* testimony triggering the need for a strenuous cross-examination. *See id.* at 170. On the contrary, the shipment of marijuana was not to Wheat but to a third-party, and Bravo had not heard of Wheat before legal proceedings had commenced. *See id.*

Nevertheless, the majority opinion rejected the dissenters' view that Iredale's conflicts were overly speculative. It emphasized the difficulty of anticipating conflicts of interest and the need for appellate courts to be highly deferential to the trial judge's judgment. *See id.* at 161–64. Disqualification motions, the Court explained, are not assessed "with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between the parties are seen through a glass, darkly." *Id.* at 162. To assess "[t]he likelihood and dimensions of nascent conflicts of interest," *id.*, courts must predict how events will unfold at trial, a daunting task that can require an exercise of "instinct and judgment based on experience," *id.* at 163.

-14-

In addition, *Wheat* recognized that trial courts have a legitimate interest in seeing "that their judgments remain intact on appeal." *Id*. at 161. Courts confronting potential conflicts of interest "face the prospect of being whip-sawed by assertions of error no matter which way they rule." *Id*. (internal quotation marks omitted). If a court disqualifies counsel, the defendant can raise (as here) a claim that he was denied his Sixth Amendment right to chosen counsel. *See id.* But if the court declines to disqualify counsel, the defendant may claim that his counsel's conflict of interest resulted in constitutionally ineffective performance at trial. *See id.* at 161–62 (noting that courts have entertained ineffective-assistance claims premised on conflicts that the defendant waived).

For these reasons, appellate courts must afford a district court's decision to disqualify counsel "broad latitude." *Id*. at 163 (also using phrase *substantial latitude* to describe requisite deference). Reflecting on the potential conflicts arising from Iredale's representation of Wheat, the Court noted that "[o]ther district courts might have reached differing or opposite conclusions with equal justification, but that does not mean that one conclusion was 'right' and the other was 'wrong.'" *Id*. at 164. "The evaluation of the facts and circumstances of each case," the Court explained, "must be left primarily to the informed judgment of the trial court." *Id*.

Mr. Evanson seeks to escape the deference *Wheat* prescribes, asserting that our review of the disqualification order is de novo. We have recognized that de

novo review is appropriate in some circumstances when the district court's frontline position gives it little if any advantage over this court in assessing the propriety of disqualifying counsel. *See United States v. Bolden*, 353 F.3d 870, 878–80 (10th Cir. 2003) (reviewing disqualification of entire United States Attorney's office with respect to defendant's motion to compel government to move for sentence reduction); *Collins*, 920 F.2d at 628 (disqualification premised on frivolous and misleading pretial pleadings). In this case, the facts presented to the district court may have been undisputed, but, as in *Wheat*, the disqualification decision required an uncertain prediction of future developments in the litigation—namely, the potential for conflicts of interest and an unsworn witness at trial. *See Bolden*, 353 F.3d at 879 (disqualification not based on significant analysis of potential conflicts). We are clearly within the realm described by *Wheat* where district-court determinations must be granted "broad latitude" because trial judges are best situated to assess the likelihood of problematic developments at trial. 486 U.S. 163 (disqualification order rested on trial court's "instinct and judgment based on experience"); *see also id.* at 173 n* (Stevens, J., dissenting) (agreeing with majority's deferential approach because it respects district court's familiarity with the litigation).[2]

---

[2]We note that although *United States v. Anderson*, 319 F.3d 1218 (10th Cir. 2003), correctly describes the circumstances in which de novo review is appropriate, *see id.* at 1221 (review is de novo when issue is "the interpretation of ethical norms as applied to undisputed facts"), it could be read as improperly

(continued...)

Mr. Evanson's insistence on de novo review appears to derive from Justice Marshall's dissent in *Wheat*, which he repeatedly cites in his brief. In Justice Marshall's view, a district court's decision to disqualify a criminal defendant's chosen counsel should be "scrutinized closely" on appeal. *Id.* at 168 (discussing "inappropriateness of deferring"). But seven Justices, including two dissenters, disagreed with that proposition. *See id.* at 163–64 (majority opinion); *see id.* at 173 & n* (Stevens, J., dissenting). We of course are bound by the majority's approach.

## B. Merits

As we understand the principles set forth in *Wheat*, the district court acted well within the broad latitude it is afforded in determining that Mr. Wheeler should be prohibited from representing Mr. Evanson because of "a serious potential for" conflict-of-interest and unsworn-witness problems. *Id.* at 164. Those problems stemmed primarily from Mr. Wheeler's apparent involvement in the creation of two letters that Mr. Evanson sent to participants in his tax

---

[2](...continued)
applying de novo review when the district court had to predict the likelihood of developments at trial. We do not, however, read the opinion as so holding. The ambiguity in our discussion arose because nothing turned on the standard of review. If we affirmed under a de novo standard, we necessarily would have affirmed under a deferential standard. Any suggestion that our review had to be de novo would therefore have been dictum.

scheme.[3]

The first letter, dated May 13, 2005, responded to a participant's request that certain real property of his that was being held in the name of an Evanson company be conveyed to him by quitclaim deed. The request was initially lodged with Mr. Wheeler; and in rejecting it, Mr. Evanson noted that Mr. Wheeler had "reviewed the matter." Aplt. App., Vol. I at 202. The letter characterized the tax scheme as an investment program and presumed, contrary to the participant's understanding, that the property was a legitimate asset of an Evanson company. The participant could acquire that property, the letter suggested, by paying off his loans with Mr. Evanson's companies and then purchasing it. The letter stressed, above all, the authenticity of the loans, stating, "I have told you in the past, even from the very beginning, that any loans provided to you were, and always must be treated as real financial relationships creating real obligations of repayment to your lender." *Id*.

The second letter, dated February 13, 2006, informed a different client of a new tax-filing requirement that would require an Evanson company to "treat certain non-performing loans as having been effectively forgiven." Aplee. Supp. App. at 233. To avoid the tax consequences of that designation, Mr. Evanson instructed the participant to "review [his] loan obligations with the company and

---

[3] On appeal the government does not base any argument on the 2006 email that Mr. Evanson sent to a participant and copied to Mr. Wheeler. We, too, rest our analysis on the letters.

ensure that required payments are being made in accordance with their terms."

*Id.* Although this letter did not mention Mr. Wheeler, codefendant Metcalf's counsel informed the government during plea negotiations that Metcalf had told him that Mr. Wheeler had reviewed the letter before Metcalf and Mr. Evanson had sent identical copies to participants.

The district court could reasonably anticipate that the letters would be offered into evidence, and admitted, at trial. The government argued that they would help prove the requisite intent. To prove that Mr. Evanson *willfully* helped participants evade tax obligations, the government had to demonstrate that he had "actual knowledge" of what the tax laws required. *Cheek v. United States*, 498 U.S. 192, 202 (1991). If Mr. Evanson "had a good-faith belief that he was not violating any of the provisions of the tax laws," he could not be found guilty. *Id.* According to the government, the letters would help it meet this standard because before its investigation, Mr. Evanson had not required repayment of "loans" and had informed participants that assets purchased in the names of Evanson companies could be transferred to the participants routinely. By concealing the true nature of the loans and nominee purchases, the letters indicated that Mr. Evanson knew that those features of his operation contravened tax laws. After all, if he thought that his scheme was lawful, why would he attempt to conceal its method of operation after learning of the government investigation? *See Spies v. United States*, 317 U.S. 492, 499 (1943) (willfulness of tax evasion

-19-

can be demonstrated by conduct likely "to mislead or to conceal"); *United States v. Guidry*, 199 F.3d 1150, 1157 (10th Cir. 1999) (same).

Although Mr. Evanson did not reveal how he intended to respond to the government's potential use of the letters, two options were available. He could insist that the letters conformed to his prior conduct while challenging the government's evidence to the contrary. Alternatively (or perhaps as a fallback position) he could contend that, in any event, the letters reflect nothing nefarious, and certainly nothing relating to his state of mind, because he prepared them in accordance with his attorney's advice. *See United States v. Samara*, 643 F.2d 701, 703 (10th Cir. 1981) (reliance on advice of fully informed counsel can "negate willfulness"). Whichever course was chosen, problems could emerge.

To begin with, Mr. Wheeler might have been inclined to discourage Mr. Evanson from asserting that the letters were the product of his advice, even if such an assertion would have helped the defense. The government had argued in plea negotiations with codefendant Metcalf that the 2006 letter was an act of obstruction that could support independent charges, a position that it reasserted in its briefing on the disqualification issue. An advice-of-counsel defense would implicate Mr. Wheeler in these allegedly unlawful acts. *See Locascio*, 6 F.3d at 933 (conflict arises if attorney is "constrained from making certain arguments on behalf of his client" or "tempted to minimize his own conduct at the expense of his client"). Thus, if Mr. Evanson were to forgo an advice-of-counsel defense at

-20-

his trial, he could attack his conviction (on appeal or in collateral proceedings) with a claim that Mr. Wheeler rejected the defense to protect himself and thereby provided constitutionally ineffective assistance.  Although Mr. Evanson suggests that a court should not consider the possibility of such a claim, it is surely proper for a court to take into account that it may be impossible to predict—and obtain firm waivers concerning—every possible conflict of interest that may arise in the proceedings.  See *Wheat*, 486 U.S. at 161 (noting the "legitimate wish of district courts that their judgments remain intact on appeal.").

If, on the other hand, Mr. Evanson were to rely on an advice-of-counsel defense, Mr. Wheeler's personal knowledge of the merits of the defense would engender problems at trial.[4]  First, Mr. Wheeler could become an unsworn witness who "subtly impart[ed] to the jury his first-hand knowledge" of the letters, thereby giving his client an unfair advantage at trial.  *Locascio*, 6 F.3d at 933.  The jury might, for example, have been inclined to credit Mr. Wheeler's suggestions through questioning of witnesses and closing argument regarding how the letters should be interpreted and the circumstances surrounding their creation—after all, he had been there.  *See id.* at 934 (attorney's interpretation of

---

[4] Although we do not assess the pretrial disqualification of counsel with "wisdom of hindsight," *Wheat*, 486 U.S. at 162, we note that at trial Mr. Evanson ultimately claimed reliance on Mr. Wheeler's advice.  He testified that he drafted the 2006 letter after consulting with a "local attorney by the name of Max Wheeler," who, he said, provided "advice on things that I should be doing to make sure that I was in proper compliance [with tax laws]."  Aplee. Supp. App. at 315–16.

taped conversations that occurred in his presence could be given improper weight). Second, by raising an advice-of-counsel defense, Mr. Evanson would waive the attorney-client privilege regarding what advice Mr. Wheeler gave him. *See United States v. Workman*, 138 F.3d 1261, 1263–64 (8th Cir. 1998); 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 503.41[1] (Joseph M. McLaughlin ed., 2d ed. 2009). This would permit the government to call Mr. Wheeler as a witness to challenge Mr. Evanson's version of events, placing Mr. Wheeler in the untenable position of providing testimony against his client. *See* Utah R. Prof'l Conduct 3.7 cmt. [6] ("[I]f there is likely to be substantial conflict between the testimony of the client and that of the lawyer, the representation involves a conflict of interest.").

Finally, the same unsworn-witness and conflict-of-interest concerns would arise if codefendant Metcalf (who had yet to plead guilty when Mr. Wheeler was disqualified) were to assert that he relied on Mr. Wheeler's advice. This was a real possibility. As noted above, Metcalf had sent an identical copy of the 2006 letter to a participant in the scheme, and his counsel had already stated in plea negotiations with the government that he had been informed that Mr. Wheeler had reviewed the letter before it was sent.

In sum, no matter how Mr. Evanson responded to the government's presentation of the letters, problems could have arisen. If he (or Metcalf) were to assert that the letters had been drafted in accordance with Mr. Wheeler's advice,

Mr. Wheeler could become an unsworn witness for Mr. Evanson or a sworn witness for the prosecution. Alternatively, if Mr. Evanson did not raise an advice-of-counsel defense, he could later assert that Mr. Wheeler discouraged him from doing so to avoid personal jeopardy arising from the allegedly obstructive letters. In this circumstance we cannot say that the district court's decision to disqualify Mr. Wheeler exceeded the "broad latitude" to which it is entitled. *Wheat*, 486 U.S. at 163.

We recognize Mr. Evanson's argument that affirmance would discourage defense attorneys from advising their clients toward "remedial or compliant conduct." Aplt. Br. at 20. Echoing observations of the magistrate judge who first passed on these issues, Mr. Evanson stresses that the 2006 letter correctly described new tax-filing requirements on forgiven loans. Thus, he says, Mr. Wheeler simply advised him on how he and the participants could comply with their tax obligations. Disqualifying him for "telling his client what the law requires," we are told, would render the "defense of persons charged with crime . . . impossible." Aplt. Reply Br. at 14.

We question Mr. Evanson's characterization of the letters. Much of their content was devoted to assertions about how various transactions between the participants and Mr. Evanson's companies had been handled. In particular, they emphasized that the phony loans were legitimate obligations. There is little in their content to suggest that they were the product of advice to Mr. Evanson about

how he needed to conform his conduct to the law. They focused on telling participants what their (longstanding) obligations were. In any event, such advice is hardly a core component of representing a client in litigation. And assisting in the production of evidence is often beyond the bounds of advocacy. An attorney representing a doctor could expect to be disqualified from acting as trial counsel if the attorney suggested "clarifying" a medical record. We do not believe that our affirmance of the district court's decision in this case presents any significant risk to proper representation of defendants in criminal proceedings.

## III. CONCLUSION

The judgment of the district court is AFFIRMED.

08-4164, *United States v. Evanson*

**McKAY**, Circuit Judge, concurring:

I join in the court's opinion with the exception of its unnecessary adoption of the Second Circuit's unsworn witness rule. This rule has never been endorsed by the Supreme Court or this Circuit, and, like the First Circuit, I would not decide whether to adopt this rule when it is not required to resolve the matters before us. *See Fonten Corp. v. Ocean Spray Cranberries, Inc.*, 469 F.3d 18, 23 (1st Cir. 2006).

I am also concerned about the breadth of this rule as adopted by the majority. I note the Second Circuit's holding in an unpublished case that—at least where the attorney in question is a prosecutor—an attorney does not act as an unsworn witness by examining a witness about a meeting in which the attorney participated, so long as the attorney does not give the jury his account of the meeting or "impermissibly impart his personal knowledge of the case, vouch for the credibility of witnesses, or bring his own credibility into issue." *United States v. Pappas*, No. 98-1206, 1999 WL 980957, at *3 (2d Cir. 1999); *see also United States v. Gholston*, 10 F.3d 384, 389 (6th Cir. 1993) (rejecting a defendant's argument that the prosecutor acted as an unsworn witness by questioning him at trial regarding an interview between them). It seems to me that if personal knowledge and participation in pretrial events are insufficient to create a serious unsworn witness problem on the part of the prosecutor—who is surely just as capable of "subtly impar[ting] to the jury his first-hand knowledge," *United*

*States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993), as defense counsel—then it is inappropriate to adopt a rule that personal knowledge and participation are sufficient to cause an unsworn witness problem on the part of defense counsel. *Cf. id.* at 934 (noting that the defense attorney in that case "had allegedly entangled himself to an extraordinary degree" in his client's allegedly illegal activities). Moreover, I agree with the First Circuit that potential unsworn witness problems caused by an attorney's personal participation in pretrial events can often be resolved through monitoring by the district court to ensure that counsel does not improperly imply that any witness's version of events is inaccurate or otherwise provide impermissible unsworn testimony. *See Fonten Corp.*, 469 F.3d at 23.

Because this case is readily affirmable without relying on the Second Circuit's unsworn witness rule, I would leave to another day, when resolution of this issue is fully and squarely required in a case before us, any consideration or adoption of such a rule.