**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 22, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

OMEGA FOREX GROUP, LC, by and
through Robert K. Flath, a Partner other
than a Tax Matters Partner,

     Plaintiff - Appellant,

v.

                                No. 17-4066

UNITED STATES OF AMERICA,

     Defendant - Appellee.
_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:14-CV-00915-BSJ)**
_____

Michael D. Black (April M. Medley, with him on the briefs), Parr Brown Gee &
Loveless, P.C., Salt Lake City, Utah, appearing for Appellant.

Anthony T. Sheehan, Attorney, Tax Division (Richard E. Zuckerman, Principal Deputy
Attorney General, Travis A. Greaves, Deputy Assistant Attorney General, Gilbert S.
Rothenberg and Bruce R. Ellisen, Attorneys, Tax Division, with him on the brief), United
States Department of Justice, Washington, DC, appearing for Appellee.
_____

Before **BRISCOE**, **BALDOCK**, and **EID**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

     Plaintiff Omega Forex Group LC (Omega), appearing by and through partner

Robert Flath (Flath), appeals from the district court's decision affirming two Notices

of Final Partnership Administrative Adjustment (FPAA) issued by the Internal Revenue Service to Omega. The two FPAAs, on the basis of fraud at the partnership level, eliminated large losses reported by Omega on its tax returns for years 1998 and 1999, and imposed penalties on Omega. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court's decision.

I

*Factual background*

*a) The parties*

Omega is a limited liability company organized under the laws of the State of Utah, with its principal place of business in Sandy, Utah. Omega was formed on or about June 23, 1994, by an attorney named Dennis Evanson. Capital West, LLC, another limited liability company controlled by Evanson, was the managing partner of Omega.

Flath, at all times relevant to this action, was an endodontist in private practice in Utah. More specifically, Flath was a corporate officer at Rocky Mountain Endodontic Associations (RME), where he practiced with other dentists. Flath also practiced dentistry as a sole practitioner under the name Rock Springs Endodontics (RSE).

*b) Flath's "investment" in Omega*

At some point in 1997 or 1998, one of the endodontists in Flath's practice suggested that Flath meet with Evanson. Flath's partner described Evanson as an expert "in options trading and general business organization and planning, tax

2

planning and asset protection." Supp. App. at 51. Flath and Evanson met in the last quarter of 1998. Evanson provided Flath with various materials regarding Omega's purported investment program, including an opinion letter from a law firm allegedly confirming the validity of the program. Flath and Evanson continued to talk during the last quarter of 1998 about the Omega program. According to Flath, Evanson indicated that Flath would have a "chance of making money" in the Omega program "based on [futures] contracts" and foreign currencies. Id. at 53.

On November 8, 1998, Flath sent a facsimile to Evanson stating that his goals included reducing his taxes, engaging in United States transactions while keeping his profits tax free, and funding his children's educations. Flath summarized his understanding of Evanson's proposed investment scheme and noted, in particular, that he would pay Evanson an initial fee of $18,000 to $20,000 and that Evanson would also receive a fee equal to 20% of Flath's tax savings.

Flath, using his RSE business account, subsequently paid Evanson a $19,700 base fee that purportedly gave Flath the right to become a capital-contributing member of Omega.

On December 20, 1998, Flath signed the paperwork to become a partner in Omega. That paperwork, however, was incomplete. In particular, it failed to specify the amount of Flath's capital contribution and Evanson never countersigned the paperwork to make Flath a partner.

3

Omega's general ledgers for 1998 show that Flath contributed a $200,000 promissory note to Omega during 1998.[1]  There is no evidence, however, that Flath ever paid this amount to Omega.  Instead, the evidence indicates that on December 22, 1998, Flath made an oral promise to contribute $165,000 in stocks to Omega before the end of 1998.  But Flath did not actually contribute the stocks to Omega until late March of 1999.  And at the time of the actual contribution, the value of the stocks was approximately $30,000 greater than its value in late December of 1998.

Beginning in January of 1999, Flath's group and solo practices, RME and RSE, began making monthly payments totaling $8,000 to an Evanson-controlled entity called Commonwealth Professional Reinsurance Ltd. (Commonwealth) for the ostensible purpose of purchasing professional liability insurance (this despite the fact that both RME and RSE already had another malpractice insurance in place at that time, for which they paid a total annual premium of $1,400).  Flath treated the monthly payments by RME as insurance premium payments and deducted those payments as business expenses on his federal tax returns for RME.  Commonwealth in turn deducted twenty percent (20%) from each premium payment and then declared a dividend to another Evanson-controlled entity based in the Cayman

---

[1] Participants in Omega's "investment" scheme "either paid cash or signed a promissory note to become a partner in an Evanson company." United States v. Evanson, 584 F.3d 904, 906 (10th Cir. 2009).  "If the participant paid cash, his payment, less [Evanson's] fee, was credited to his account." Id.  "If he signed a promissory note, he was under no obligation to make payments on the underlying loan; on the contrary, if a participant made a 'loan payment,' the amount was credited to his account and, as a bonus, frequently reported as a home-mortgage-interest deduction." Id.

4

Islands called International Capital Group (ICG). That dividend was allocated by ICG to Flath's fund in ICG.

Flath, through an Evanson-controlled entity called Cottonwood Financial, was able to receive fake loans that effectively allowed him to access his "investment" money in the Omega scheme. In addition, Flath utilized yet another Evanson-controlled entity, Children's Charities, to effectively pay his children's school tuition. More specifically, Flath would make purported tax-deductible donations to Children's Charities and Children's Charities in turn would give purported scholarships or loans to Flath's children.

Lastly, Flath was able, using the money he had allegedly invested in Omega, to buy and sell other stocks through ICG in order to avoid having to report the trading in his tax returns. Evanson allegedly advised Flath that this process was legal.

In sum, Evanson, in exchange for Flath's agreed payments, "manufactured fictitious transactions to conceal income [for Flath] and create apparent [tax] deductions [for Flath]." Evanson, 584 F.3d at 905.

*c) Flath's 1998 and 1999 tax returns*

In February of 1999, Omega sent Flath a 1998 K-1 tax form stating that he had contributed capital during 1998 totaling $200,000 and that his capital account at the end of 1998 was $49,881. On September 27, 1999, Omega filed a Form 1065 United States Partnership Return of Income for the 1998 tax year indicating, in pertinent part, that Flath had contributed $200,000 to join Omega. The K-1 tax form further stated that Omega had sustained a loss of $4,698,325 during 1998 as a result of

5

foreign currency speculation, that Flath's percentage of that loss was 3.19%, and that the resulting amount of Flath's loss in dollars was $150,119. On March 25, 1999, Flath and his wife filed a joint federal tax return for 1998 in which they claimed a pass-through loss from Omega in the amount of $149,856. In doing so, Flath falsely assured his accountant and tax preparer, Gail Anger, that he had contributed "at least that much to" Omega during 1998. Supp. App. at 149.

Flath's solo business, RSE, filed a 1998 tax return that listed as an ordinary and necessary expense the $20,000 fee that Flath paid to Evanson. Flath did not inform Anger of the true nature of the expense.

For tax year 1999, Flath told the IRS that he contributed $100,000 in cash to Omega. In fact, however, Flath made no such cash contributions to Omega. Instead, Flath's endodontic businesses, RME and RSE, paid a total of $72,000 (comprised of nine monthly payments of $8,000 each) to Commonwealth during 1999.

In February of 2000, Omega sent Flath a 1999 K-1 tax form stating that Flath's share of Omega's "[q]ualified nonrecourse financing" liabilities was $249,713. Id. at 101.

On March 13, 2000, Flath and his wife filed a joint federal tax return for 1999 in which they claimed a pass-through loss from Omega in the amount of $86,724.

On June 19, 2000, Omega filed a Form 1065 United States Partnership Return of Income for the 1999 tax year.

In preparing the 1998 and 1999 returns, Flath was not completely forthcoming with Anger, his tax accountant. For example, Flath did not tell Anger that Flath was

6

a member of an offshore company called ICG, or that Flath's businesses were purportedly paying for supplemental malpractice insurance through Commonwealth.

### d) Flath's purported withdrawal from Omega

Flath made no further investments in Omega and took no deductions related to Omega after 1999. In 2002, Flath allegedly ended his investment in Omega. At no time during his involvement with Omega, however, did Flath actually take the steps necessary to become a member of Omega. In particular, Flath never signed and executed a required Operating Agreement. Further, although Flath signed a Capital Contribution Agreement, it was never executed by Evanson, Omega's managing member. In addition, the Capital Contribution Agreement "[was] blank where an amount of not less than $10,000 must be recorded." Aplt. App. at 90. Lastly, Flath never made the required $10,000 capital contribution in money to Omega.

### e) The indictment of Evanson

In 2005, a grand jury indicted Evanson and other individuals related to Omega. In February 2008, Evanson was convicted of conspiracy to commit mail and wire fraud, tax evasion, and assisting in the filing of false tax returns.

### f) IRS action against Evanson and Omega

On November 9, 2009, the IRS issued to Evanson, as the Tax Matters Partner for Omega, a Notice of Beginning of Administrative Proceeding (NBAP). The NBAP essentially notified Evanson that the IRS was beginning an audit of Omega's partnership tax returns. A copy of the NBAP was also sent to Flath.

7

On August 11, 2014, the IRS issued two FPAAs that made adjustments to Omega's 1998 tax return (the 1998 FPAA) and 1999 tax return (the 1999 FPAA). The 1998 FPAA indicated that the IRS was eliminating entirely Omega's alleged $4,698,325 loss for tax year 1998 due to fraud at the partnership level. Similarly, the 1999 FPAA indicated that the IRS was eliminating entirely Omega's alleged $3,058,405 loss for tax year 1999 due to fraud at the partnership level.

Evanson did not file a petition for readjustment within the ninety days allowed by 26 U.S.C. § 6226(a), and no partner of Omega other than Flath attempted to challenge the FPAAs.[2]

g) *Flath's response to the FPAAs*

On December 16, 2014, Flath's counsel sent a letter to the IRS "remit[ting] the amount of $93,687.00 . . . and designat[ing] th[e] remittance as a deposit under IRC §6226 [sic]." Id. at 42. The letter stated that "[t]he amount of the deposit was calculated by multiplying the amount of all deductions related to Omega that were claimed on . . . Flath's 1998 and 1999 tax returns and multiplying that amount by 39.6%, the highest marginal rate in effect during those years." Id.

On April 8, 2015, Flath made a deposit with the IRS related to the FPAAs in the amount of $252,076.86. On March 12, 2015, the IRS issued Notices of Computational Adjustment to Flath and his ex-wife.

---

[2] At that time, § 6226(a) was entitled "Petition by tax matters partner" and it gave "the tax matters partner" ninety days within which to "file a petition for a readjustment of the partnership items" listed in an FPAA. 26 U.S.C. § 6226(a) (2013). Section 6226(a) has since been amended.

## II

### *Procedural background*

On December 18, 2014, Omega, appearing by and through Flath, initiated this action by filing a complaint in federal district court against the United States. The complaint was captioned "PETITION FOR READJUSTMENT OF PARTNERSHIP ITEMS UNDER INTERNAL REVENUE CODE SECTION 6226." Id. at 13. The complaint purported to "challenge[] the adjustments that the [IRS] . . . determined should be made to the Form 1065 partnership tax returns filed by Omega for the taxable years ended [sic] December 31, 1998 and December 31, 1999." Id. at 13–14. The complaint alleged that "[t]he issues in th[e] case [we]re whether the statute of limitations for assessment ha[d] expired as to . . . Flath's interest in Omega, whether the IRS should be barred under the doctrine of laches from pursuing the assessments, and whether the adjustments [outlined in the two FPAAs] [we]re valid and correct." Id. at 14. The complaint requested a refund of Flath's deposits related to the FPAA assessments, as well as attorneys' fees pursuant to 26 U.S.C. § 7430.

The parties filed cross-motions for summary judgment. On August 7, 2015, the district court issued an order granting partial summary judgment in favor of the United States "on the issue of whether the defense of laches bar[red] the United States from enforcing its tax claims" against Flath. Id. at 54.

After additional discovery, the parties filed a second round of summary judgment motions. On December 20, 2016, the district court issued an order denying the motions on the grounds that there "[we]re issues of fact and credibility necessary

9

to the resolution of the motion[s] that c[ould] only be resolved at trial." Id. at 58. The district court did rule as a matter of law, however, "that the taxpayer must have the requisite intent [to commit fraud] in order to extend the statute of limitations pursuant to 26 U.S.C. §6501(c)(1) [sic]." Id. "Specific to this case," the district court stated, "the [United States] must prove that . . . Flath had the requisite intent in order to extend the statute of limitations for his joint returns in 1998 and 1999." Id.

The United States' position was that "Flath's 1998 and 1999 returns were false or fraudulent and [his] intent to evade tax relating to these returns ke[pt] the statute of limitations open under Section 6501(c) for the IRS to make assessments on th[o]se returns." Id. at 60. The United States further alleged "that Flath participated indirectly in the preparation of the Omega . . . return[s]" and that those "returns d[id] not qualify as returns under the relevant test." Id. at 61.

The matter proceeded to a bench trial on February 6, 2017. The purpose of the trial was "to consider [Flath's] use in his returns of pass through losses created by Omega." Omega Forex Grp., LC v. United States, No. 2:14-CV-00915-BSJ, 2017 WL 927604 at *1 (D. Utah Mar. 8, 2017). More specifically, the trial court focused on "whether or not by clear and convincing evidence Flath intended to defraud the United States of rightfully owed taxes for each year." Id. After hearing all of the evidence, the district court concluded that "[t]he short answer as to intent [wa]s yes." Id. In support of this conclusion, the district court found that "[w]hen Flath signed his 1998 tax return on March 25, 1999, his purported $200,000 capital contribution used as the basis to allocate his loss was non-existent." Id. (footnote omitted). The

10

district court in turn found that "what [wa]s important [wa]s that the $165,000—less a fee to Evanson—by some special form of bookkeeping sleight of hand, ended up in a protector account in a Cayman Island entity called . . . ICG." Id. That ICG account, the district court found, "was controlled by Evanson but subject to the will of Flath." Id. "In short," the district court found, "the capital contribution [of Flath], whenever it was made, passed through to [ICG] for the benefit of Flath, who suffered no loss at all." Id. Thus, the district court found, "Flath kept substantially all of his capital contribution less Evanson's fee." Id. The district court also found that Flath "did not tell [Anger, his accountant,] about a protector account located in the Cayman Islands where $165,000—paid thereafter—would be placed on deposit free from currency speculation and available for use for the purchase of stock shares or the payment of the more mundane expenses of life such as tuition for a child." Id. at *2.

As for Flath's 1999 tax return, the district court found that "[t]he experience was similar." Id. Although "the K-1" form issued by Omega to Flath "showed Flath's share of [Omega's purported] loss to be $85,793," the district court found that Flath sustained no such loss. Id. Specifically, the district court found that "[t]he initial balance of [Flath's] ICG account for 1999 had been augmented by periodic transfers from" Commonwealth, and that "Commonwealth . . . purportedly sold . . . to Flath and his endodontic practices a secondary malpractice policy with a monthly premium of $8,000 per month." Id. But, the district court found, "[t]hat monthly premium payment amount, less a fee to Evanson, was periodically transferred to Flath's ICG account." Id. In other words, the district court found that "[t]hrough

11

creative bookkeeping, the insurance premium payments made by Flath's endodontic practices to Commonwealth . . . ended up, less Evanson's fee, as capital contributions for Flath's personal interest in Omega . . . and as amounts in Flath's ICG account that Flath could continue to draw down upon." Id.

The district court further found as follows:

Flath was a college graduate, a retired naval officer of twenty years, and a private dentist with a practice that produced revenues of several hundred thousand dollars per year. Had he made a capital contribution in 1998 of $200,000 to Omega . . . for currency speculation, as noted in the 1998 K–1 provided to him, he would have been aware of it. Had he made a contribution of $100,000 in 1999 to Omega . . . for currency speculation, as noted in the 1999 K-1 provided to him, he would have been aware of it. What he did pay through stock sales, less fees to his tax expert Evanson, ended up on deposit with ICG subject to his control. Flath's "at risk" capital contribution—purportedly lost—was used by him from time to time to buy stocks and to pay family expenses. Flath knew that as well.

Id.

The district court rejected Flath's assertion that "he relied on 'expert advice'— namely, Evanson and CPAs Gail Anger and Bryce Olson—which [could have] negated fraudulent intent." Id. at *3. The district court noted that "[i]t is a strange form of 'expertise' which suggests one may still spend what is lost." Id. In any event, the district court found that "[i]n reality, what Evanson was providing Flath was tax deductions purportedly from unsuccessful currency speculations by Omega . . . with a guaranty that money purportedly at risk was not at risk at all." Id. "As to CPAs Gail Anger and Bryce Olson," the district court found that Flath did not supply them with "accurate and complete information." Id.

12

Based on these findings, the district court denied the claims for relief asserted in the petition and upheld "the adjustments in the Omega . . . FPAAs that disallow[ed] the fraudulent Section 988 losses." Id. The district court also "determine[d] that the fraud penalty [wa]s applicable to such losses," and that "the statute of limitations as to Flath [wa]s still open to make the assessments relating to such adjustments." Id.

Final judgment was entered on March 27, 2017. Flath filed a notice of appeal on April 27, 2017.

### III

Flath, on behalf of Omega, raises three issues on appeal: (1) whether the district court erred in holding that the FPAAs issued by the IRS to Omega were not barred by the applicable statute of limitations; (2) even assuming the district court applied the proper statute of limitations, whether it incorrectly applied the legal standards for determining whether Flath had fraudulent intent as to his personal tax returns; and (3) whether the district court erred in determining the asserted fraud penalty at the partnership level.[3] For the reasons discussed below, we reject all of these arguments.

---

[3] In the "Statement of Issues" section of Flath's opening brief, he identifies six issues on appeal. But the first two issues he identifies—whether the district court "err[ed] in holding that the statute of limitations remained open for assessment of the" FPAAs and whether the district court "appl[ied] the incorrect statute of limitations to the FPAAs by failing to apply 26 U.S.C. § 6229"—are the same. Aplt. Br. at 2. Consequently, we will treat them as one issue. Likewise, the third, fourth, and fifth issues identified by Flath—whether the district court "err[ed] in finding that [he] had fraudulent intent as to his personal tax returns," whether the district court

13

*The Code's framework for taxing partnerships and partners*

Before addressing the issues raised by Flath on appeal, we begin by briefly reviewing the Code's framework for the taxation of partnerships and partners. "Unlike individuals and corporations, partnerships are not separately taxable entities." Chai v. Comm'r, 851 F.3d 190, 196 (2d Cir. 2017). "A partnership's income and expenses pass through to the individual partners, who must pay a tax on their proportionate shares of net gain or may claim a deduction for their shares of net loss." Id. Until recently, "[p]artnership tax [wa]s subject to the procedures set forth in the Tax Equity and Fiscal Responsibility Act of 1982 ('TEFRA'), Pub. L. No. 97-248, 96 Stat. 324 (codified as amended at I.R.C. §§ 6221–6234)." Id. Congress enacted TEFRA "to promote consistent tax treatment of partners and to avoid duplicative litigation." Prati v. United States, 603 F.3d 1301, 1305 (Fed. Cir. 2010). Although TEFRA was recently repealed (effective January 1, 2018), its provisions still apply to the case at hand.

TEFRA "require[d] partnerships to file informational returns reflecting the distributive shares of income, gains, deductions, and credits attributable to its partners." Curr-Spec Partners, L.P. v. Comm'r, 579 F.3d 391, 394 (5th Cir. 2009) (quotations omitted). "Accordingly, the individual partners [we]re responsible for

"exceed[ed] the scope of its subject matter jurisdiction in this partnership-level proceeding by evaluating Flath's outside tax basis in his Omega partnership interest," and whether the district court "appl[ied] the incorrect legal standard to determine whether [his] reliance on expert advice negated a finding that he had fraudulent intent as to his personal tax returns"—are related and will be treated as one general issue. Id. at 2-3.

14

reporting their pro rata share of tax on their income tax returns." Id. (quotations omitted). "Items more appropriate for determination at the partnership level [we]re designated 'partnership items,' which [we]re to be treated at the partnership level; other items [we]re designated 'nonpartnership items,' which [we]re to be treated at the individual partner level." Id.

"To initiate adjustments to partnership items, TEFRA require[d] the IRS to conduct a unitary audit of the partnership and issue a final partnership administrative adjustment ('FPAA') to the partners, which the partners [could] challenge in a single judicial proceeding . . . ." Chai, 851 F.3d at 196. Thus, an FPAA "[wa]s analogous to the statutory notice of deficiency furnished to individuals." Curr-Spec, 579 F.3d at 394. "After the FPAA bec[ame] final, the Commissioner [could] assess tax to the individual partners whose tax returns for the year or years in question remain[ed] open under IRC § 6501(a), for those partners' distributive shares of the adjusted partnership items." Id. at 394–95.

Under TEFRA, each partnership was required to designate a "tax matters partner" (TMP). 26 U.S.C. § 6231(a)(7). The TMP was authorized to take actions on behalf of the partnership, but TEFRA also required that the other partners be given notice of, and be allowed to participate in, administrative and judicial proceedings regarding the partnership. Partners with a 1% or greater interest in the partnership were classified as "notice partners" entitled to notice from the IRS of the TEFRA partnership proceeding, including the FPAA. 26 U.S.C. §§ 6223(b), (d), 6224(a).

15

If the TMP did not file a petition contesting an FPAA within 90 days after the IRS mailed it, any notice partner could file a suit in the Tax Court, the Court of Federal Claims, or the appropriate district court within the 60-day period following the expiration of the 90-day period given to the TMP. 26 U.S.C. § 6226(a), (b). If a notice partner petitioned in the district court or the Court of Federal Claims, he or she had to first deposit with the IRS the amount by which his or her taxes would be increased if the court were to uphold the adjustments set forth in the FPAA. 26 U.S.C. § 6226(e)(1). The court overseeing the petition had jurisdiction to determine all partnership items for the partnership taxable year, the proper allocation of those items among the partners, and the applicability of any penalty or other addition to tax related to an adjustment of a partnership item. 26 U.S.C. § 6226(f). Of special importance to the case at hand, the court also had jurisdiction to adjudicate an assertion by a participating partner that the limitations period for assessing partnership-related taxes against him or her had expired.[4] 26 U.S.C. § 6226(d)(1)(B) (stating that "any person treated under subsection (c) as a party to an action shall be permitted to participate in such action . . . solely for the purpose of asserting that the period of limitations for assessing any tax attributable to partnership items has expired with respect to such person, and the court having jurisdiction of such action shall have jurisdiction to consider such assertion").

---

[4] As the government notes, "each partner could have his own limitations period for partnership-related assessments against him, and limitations defenses regarding such assessments were adjudicated at the partnership level." Aple. Br. at 34.

16

In this case, Evanson, who was Omega's TMP, did not file a petition contesting the two FPAAs issued by the IRS to Omega. But Flath, a notice partner of Omega, exercised his right to challenge the FPAAs by filing this suit and depositing the specified amount with the IRS. The district court in this case then resolved the specific issues raised by Flath, including whether the FPAAs were properly issued, whether Omega was subject to a penalty, and whether the statute of limitations had run against Flath personally.

*Does the statute of limitations bar the FPAAs issued to Omega?*

In his first issue on appeal, Flath argues that the district court erred in holding that the statute of limitations did not bar the FPAAs issued by the IRS to Omega. We review de novo the district court's application of a statute of limitations. Leathers v. Leathers, 856 F.3d 729, 757 (10th Cir. 2017).

Internal Revenue Code § 6501(a) establishes a default three-year statute of limitations for the assessment[5] and collection of taxes: "Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed . . . ." 26 U.S.C. § 6501(a). Other Code provisions, however, serve to extend, toll, or create exceptions to this default three-year period of limitations. In particular, if a return is "false or fraudulent . . . with the intent to evade tax, the tax may be assessed . . . at any time." 26 U.S.C. § 6501(c)(1).

---

[5] An "assessment" is the official recording of a taxpayer's liability by the IRS. 26 U.S.C. § 6203.

17

Flath argues, however, that this case is governed by what he characterizes as a separate and distinct statute of limitations set forth in now-defunct (but still applicable to this case) § 6229. Section 6229 was enacted as part of TEFRA.[6] Section 6229 was entitled "Period of limitations for making assessments," and subsection (a) thereof stated:

> (a) **General rule**.—Except as otherwise provided in this section, the period for assessing any tax imposed by subtitle A with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year shall not expire before the date which is 3 years after the later of—
> (1) the date on which the partnership return for such taxable year was filed, or
> (2) the last day for filing such return for such year (determined without regard to extensions).

26 U.S.C. § 6229(a).

Subsection 6229(c), entitled "Special rule in case of fraud," provided, in pertinent part:

> (1) **False return**.—If any partner has, with the intent to evade tax, signed or participated directly or indirectly in the preparation of a partnership return which includes a false or fraudulent item—
> (A) in the case of partners so signing or participating in the preparation of the return, any tax imposed by subtitle A which is attributable to any partnership item (or affected item) for the partnership taxable year to which the return relates may be assessed at any time, and
> (B) in the case of all other partners, subsection (a) shall be applied with respect to such return by substituting "6 years" for "3 years."

26 U.S.C. § 6229(c)(1).

---

[6] The Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, 131 Stat. 2054 (2017), amended the Code and eliminated § 6229. The parties agree, however, that the pre-2017 Code provisions are applicable to this dispute.

Flath argues that where, as here, a case involves a partnership return, "[t]he first step in computing each tax partner's statute of limitations is to refer to the primary limitations statute found in . . . § 6501." Aplt. Br. at 14. "The second step," Flath asserts, "is to determine whether any extensions to the statute of limitations apply." Id. But, he asserts, none of those extensions "apply to partnership proceedings" because, in his view, § 6501 "applies solely to the personal return filed by the taxpayer." Id. "In other words," he argues, "the Omega partnership return and items on that return are not considered for purposes of [§] 6501." Id. at 15. "Instead," Flath asserts, § "6501(n)(2) refers one to the TEFRA partnership provisions to determine whether any extensions apply." Id. Section 6501(n)(2) stated (prior to the recent amendments): "For extension of period in the case of partnership items (as defined in section 6231(a)(3)), see section 6229."[7] 26 U.S.C. § 6501(n) (2015). Flath argues that, "[r]eading Section 6501 and Section 6229 together, the computation of a tax partner's statute of limitations with respect to a partnership item (such as the currency trading losses here) starts with the general 3 year assessment period and is extended beyond that solely according to Section 6229." Aplt. Br. at 15.

Flath in turn argues that "Section 6229(c) sets two different limitations periods related to partnership items depending on the partner's involvement in an allegedly fraudulent partnership: culpable partners who help prepare the partnership return are

_____

[7] Section 6501(n), as recently amended, now makes no reference to partnerships or the non-existent § 6229.

19

subject to an indefinite limitations period; all other partners are subject to a six year period." Aplt. Reply Br. at 3. Flath argues that "[h]ere, the IRS has not shown (nor did the District Court find) that Flath falls into the group of culpable partners, therefore he is in the 'other' category" and, consequently, "the statute of limitations (normally three years) was only extended to six years and expired before the FPAAs were issued." Id.

The government, not surprisingly, has an entirely different view of how § 6229 should be interpreted and, as well, how §§ 6501 and 6229 were intended to operate together. According to the government, § 6229 "was not" intended by Congress as "an independent statute of limitations for assessing partnership-related taxes," but rather worked in conjunction with § 6501 to extend the general three-year statute of limitations under certain circumstances in cases involving partnerships. Aple. Br. at 30. In other words, the government argues, § 6229 was not intended by Congress to "shorten the three-year period of §6501(a)," but rather was intended to "extend that period by establishing a minimum time for assessing partnership-related taxes." Id. at 31.

Three federal appellate courts have addressed this issue and all agree with the government's position. Most recently, the Fifth Circuit rejected the notion "that IRC § 6229(a) is an independent three-year limitations period for the issuance of an FPAA, which period begins to run on the later of the date that the partnership files its informational return or the date that it is due." Curr-Spec, 579 F.3d at 396. Instead, the Fifth Circuit concluded:

20

> The unambiguous language of IRC § 6229(a) and IRC § 6501(a) mandates our conclusion that IRC § 6501(a) creates a three-year limitations period within which the Commissioner must assess "any tax" on individual partners—a period which IRC § 6229(a) can never shorten, regardless of the length of time that might have elapsed between the filing of the partnership's informational return and the Commissioner's issuance of an FPAA. Rather, IRC § 6229(a) establishes only the minimum time period that, when necessary, extends, i.e., supercedes [sic], the general three-year limitations period of IRC § 6501(a). For partnership items, the otherwise applicable limitations period of IRC § 6501(a) "<u>shall not expire before</u> the date which is 3 years after the later of . . . the date on which the partnership return . . . was filed" or the date on which it was due.

Id. (alteration in original). The Fifth Circuit agreed with the Tax Court that "[s]ection 6229 provides a *minimum* period of time for the assessment of any tax attributable to partnership items (or affected items) notwithstanding the period provided for in section 6501, which is ordinarily the *maximum* period for the assessment of any tax," and that, consequently, "[t]he section 6229 minimum period may expire before or after the section 6501 maximum period." Id. at 397 (quoting Rhone-Poulenc Surfactants & Specialties, L.P. v. Comm'r, 114 T.C. 533, 542 (2000) (en banc) (emphasis added by Tax Court)).

Similarly, the Federal Circuit held that, "[b]ased on the plain text of the statute, § 6229(a) does not create an independent statute of limitations." AD Global Fund, LLC ex rel. N. Hills Holding, Inc. v. United States, 481 F.3d 1351, 1354 (Fed. Cir. 2007). The court noted that "[u]nlike the unequivocal language creating a statute of limitations in § 6501, § 6229(a) contains no mandatory words establishing a time within which assessments must be made." Id. at 1354. More specifically, the court noted that "the three-year limitations period in § 6229(a) does not unambiguously

21

define an end date for making an assessment because it uses the phrase 'shall not expire before' and thus leaves open the possibility that the applicable limitations period may expire after the periods set forth therein." Id. (quotations omitted).

The Federal Circuit also explained that the scheme outlined in TEFRA, which included § 6229, "contemplate[d] that adjustments to partnership items are made in one proceeding before assessments are made at the individual partner level." Id. at 1355. This interpretation, the Federal Circuit noted, "may extend the regular statute of limitations in § 6501(a) for assessments to individual partners, but it does not alter the statutory scheme of determining partnership items in one partnership-level proceeding." Id. This construction, the Federal Circuit thus held, "is consistent with a statutory scheme that intends that adjustments to a partnership tax return be completed in one consistent proceeding before individual partners are assessed for partnership items." Id.

Lastly, the D.C. Circuit also "affirm[ed] the Tax Court's interpretation" of §§ 6501 and 6229. Andantech, L.L.C. v. C.I.R., 331 F.3d 972, 976 (D.C. Cir. 2003). More specifically, the D.C. Circuit agreed with the Tax Court "that § 6501 provides a general period of limitations for assessing and collecting any tax imposed by the Code, and that § 6229(a) sets forth a minimum period for assessing any income tax with respect to any person that is attributable to any partnership item or affected item." Id. In other words, "the 'shall not expire' language of § 6229, together with the broad application of § 6501 work in conjunction to provide for a minimum or extension of the § 6501 period, not an independent statute of limitations for

22

partnership items." Id. at 977. "This interpretation," the D.C. Circuit noted, "ensure[s] that the IRS could assess a partnership tax against a late or non-filing partner." Id.

Notably, Flath offers no arguments that seriously undercut the reasoning of these three decisions. Indeed, Flath mentions only the Curr-Spec decision in his appellate pleadings and, in doing so, does not attempt to challenge its key holding. He makes no mention at all of AD Global or Andantech. He does cite to a different Federal Circuit court opinion, Prati v. United States, 603 F.3d 1301 (Fed. Cir. 2010), for the proposition "that 26 U.S.C. §§ 6229 and 6501 operate in tandem to provide a *single* limitations period—not a menu from which the IRS can choose." Aplt. Reply Br. at 3. Curiously, however, that proposition, which is correct, actually undercuts Flath's argument that the statute of limitations in this case is controlled exclusively by § 6229. See Prati, 603 F.3d at 1307 ("[T]he limitations period is the period defined by section 6501, as extended when appropriate by section 6229. Sections 6501 and 6229 do not operate independently to allow a taxpayer to assert one in isolation and thereby render an otherwise timely assessment untimely.").

We conclude that the interpretation urged by the government and adopted by the Fifth, Federal and D.C. Circuits is sound and should be applied in this case. Under that interpretation, the applicable limitations period is defined by § 6501 and, because Flath's individual return was determined to be "false or fraudulent . . . with the intent to evade tax," the limitations period is endless, i.e., "the tax may be assessed . . . at any time." 26 U.S.C. § 6501(c)(1).

23

*Did the district court correctly apply the legal standards to determine whether Flath had fraudulent intent as to his personal tax returns?*

In his second issue on appeal, Flath argues that, even assuming the district court applied the correct statute of limitations, the district court "incorrectly applied the legal standards to determine whether Flath had fraudulent intent as to his personal returns." Aplt. Br. at 17–18. In support, Flath asserts that the district court "exceed[ed] its jurisdiction by evaluating and determining Flath's outside tax basis— which is not a partnership item properly considered in a TEFRA partnership level proceeding." Id. at 18–19. Flath further asserts that "the District Court applied the wrong legal standard in evaluating whether [his] reliance on expert advice negated any fraudulent intent with respect to his personal returns." Id. at 19.

Flath is wrong in asserting that the district court lacked jurisdiction to consider his outside tax basis, i.e., the value of the assets that he contributed to the Omega partnership, for purposes of determining whether he had fraudulent intent as to his personal returns. See Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 972 (Fed. Cir. 2009) ("A partnership's basis in its assets is referred to as its 'inside basis,' and a partner's basis in his or her partnership interest is called his or her 'outside basis.'"). As previously noted, § 6226(d) provided the district court with jurisdiction to adjudicate Flath's assertion that the limitations period for assessing Omega's partnership-related taxes against him had expired. That grant of jurisdiction necessarily allowed the district court to examine any and all items on Flath's personal returns for purposes of determining whether Flath had fraudulent intent in filing those

24

returns. In doing so, the district court properly considered the entirety of Flath's relationship with Omega, including the value and timing of the assets he actually contributed to Omega (i.e., his outside tax basis in Omega), versus the amounts that Omega reported in its records and that Flath reported on his personal tax returns. The district court also properly considered Flath's transactions with the other Evanson-controlled entities because, as the government notes, "those matters were relevant to the issue whether Flath committed fraud on his individual returns." Aple. Br. at 39.

Flath is also wrong in arguing that the district court erred in considering his reliance on outside accounting and legal advice. Flath argues that "[t]he District Court should have stopped when it found that [he] relied on Evanson's and Anger's advice, and the District Court should have found that Flath lacked fraudulent intent as to his personal returns." Aplt. Br. at 24. In other words, Flath argues, "no matter whether the advice was good or reasonable, Flath did not procure it fraudulently, and no facts were introduced at trial or found by the District Court to support such a finding." Id. As for Anger (Flath's accountant) specifically, Flath argues that "[i]f Anger needed additional information" from Flath, "it was [Anger's] obligation to request it." Id. "It certainly cannot be considered fraud," Flath argues, "to fail to affirmatively provide that which is not requested." Id.

Flath's arguments, however, ignore a key point of law, as well as the evidence presented at trial. As this court indicated long ago in Davis v. Comm'r, 184 F.2d 86, 88 (10th Cir. 1950), taxpayer reliance on expert advice hinges, in part, on the taxpayer making "a full disclosure to the expert preparing" his tax return. In the case

25

at hand, however, the evidence presented by the government at trial established, and the district court expressly found, that Flath actively concealed information from Anger (and Olson) that was relevant to preparation of Flath's personal tax returns. For example, the evidence indicated that Anger expressly told Flath that Anger was claiming the $149,857 Omega loss on Flath's 1998 personal tax return "based on [Flath's] statement that [he] had contributed at least that much to [Omega]." Supp. App. at 149. The evidence, however, clearly established that Flath had not made the requisite capital contribution to Omega, but nevertheless failed to disclose this information to Anger. The evidence also clearly established that Flath failed to inform Anger that he suffered no loss at all, and that the capital contribution Flath eventually made to Omega ended up in a protector account in the Cayman Islands and available for Flath's use. Flath also, with regard to the 1998 tax return, failed to tell Anger that a $19,700 deduction for legal expenses on the tax return was actually the amount that Flath paid to Evanson as the membership fee to join the Omega investment scheme. As for Flath's 1999 tax return, the evidence of him concealing information from Anger was even more egregious. In short, Flath lied to Anger about "the source of his purported $100,000 contribution to Omega," "repatriated untaxed or already deducted income under labels calculated to deceive the IRS," and "excluded from income or deducted the alleged insurance premiums that landed in his ICG membership." Aple. Br. at 51. In sum, because Flath failed to disclose all relevant financial information to Anger, he is in no position to argue that he reasonably relied on Anger's tax advice.

26

As for Flath's purported reliance on "legal advice," he is referring to a letter that Evanson provided him from a law firm. The district court found, however, that the letter "did not relate to Omega . . . and [thus] d[id] not help Flath." Dist. Ct. Docket No. 83 at 6. Notably, Flath does not challenge this factual finding on appeal. And a review of that letter, which is included in the government's supplemental appendix, indicates that it discusses "the material federal income tax consequences to [Evanson] in connection with the Euro Pacific Corporation," not Omega. Supp. App. at 109. Thus, it is clear that Flath did not receive or rely on any "legal advice" stating that the Omega scheme was proper, let alone any advice indicating that the entries on his personal tax returns were proper.

In the section of his opening brief that argues the district court "incorrectly applied the legal standards to determine whether Flath had fraudulent intent as to his personal tax returns," Aplt. Br. at 17–18, Flath also asserts, in passing, a separate and distinct issue that is not mentioned in his table of contents or Statement of Issues, i.e., that "[t]he District Court should have focused on whether the currency trading losses [by Omega] were allowable at the partnership level and fraudulent as to Flath," and that "[t]he District Court did not make sufficient findings to disallow the losses at the partnership level." Id. at 20. Assuming, for purposes of argument, that this is intended by Flath to be a separate and distinct issue on appeal, we conclude there is no merit to it.

As the government notes in its appellate response brief, the assessments made by the Commissioner in the two FPAAs issued to Omega are presumed to be correct,

27

and it was Flath's burden, as the petitioner in this case, to prove that those assessments were wrong.  Welch v. Helvering, 290 U.S. 111, 115 (1933); Crescent Holdings, LLC v. Comm'r, 141 T.C. 477, 485 (T.C. 2013) ("The Commissioner's determinations in an FPAA are generally presumed correct, and a party challenging an FPAA has the burden of proving that the Commissioner's determinations are in error.").  Notably, Flath makes no attempt in his appellate brief to explain why Omega's currency trading losses should have been allowable, nor does he cite to any portions of the trial transcript relevant to that issue.  In other words, as the government argues in its response brief, "Flath makes no attempt in his brief to make an affirmative case why, on the evidence, the District Court erred in upholding the IRS's disallowance of the losses."  Aple. Br. at 54.  Thus, the issue appears to have effectively been waived by Flath.

*Did the district court err in determining the asserted fraud penalty at the partnership level?*

In his third and final issue on appeal, Flath argues that, "[s]eparate from the entire question of whether the District Court properly upheld the FPAAs['] disallowance of the trading losses on the Omega partnership returns, the District Court also upheld the IRS'[s] assessment of the fraud penalty at the partnership level in the FPAAs."[8]  Aplt. Br. at 26.  Flath argues that "[t]his exceeded the District

---

[8] In the FPAAs, the IRS determined that Omega's claimed currency trading losses were fraudulent at the partnership level, and the FPAAs asserted that Omega was subject to a fraud penalty pursuant to 26 U.S.C. § 6663(a).  Section 6663(a) imposes a penalty of 75% of the portion of any underpayment of tax attributable to fraud.

Court's jurisdiction and was error." Id. That is because, Flath argues, a "fraud penalty is not a partnership item, and is not included in that grant of jurisdiction." Id. We disagree.

As relevant to this case (and prior to its recent repeal), Section 6226(f) of the Code stated:

> A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

26 U.S.C. § 6226(f) (2016) (emphasis added).

In United States v. Woods, 571 U.S. 31 (2013), the Supreme Court held that "a court in a partnership-level proceeding [under TEFRA] has jurisdiction to determine not just partnership items, but also 'the applicability of any penalty . . . which relates to an adjustment to a partnership item.'" Id. at 39 (quoting § 6226(f)). The Court also held that "[p]rohibiting courts in partnership-level proceedings from considering the applicability of penalties that require partner-level inquiries," such as outside basis, "would be inconsistent with the nature of the 'applicability' determination that TEFRA requires." Id. at 40. "Under TEFRA's two-stage structure," the Court explained, "penalties for tax underpayment must be *imposed* at the partner level, because partnerships themselves pay no taxes . . . [a]nd imposing a penalty always requires some determinations that can be made only at the partner level." Id. "Yet," the Court continued, "notwithstanding that every penalty must be imposed in partner-

29

level proceedings after partner-level determinations, TEFRA provides that the *applicability* of some penalties must be determined at the partnership level." Id. at 40–41. Thus, the Court stated, "[t]he applicability determination is therefore inherently provisional; it is always contingent upon determinations that the court in a partnership-level proceeding does not have jurisdiction to make." Id. at 41. In short, "[b]arring partnership-level courts from considering the applicability of penalties that cannot be imposed without partner-level inquiries would render TEFRA's authorization to consider some penalties at the partnership level meaningless." Id.

In light of § 6226(f) and Wood, we conclude that the district court in this case did not exceed its jurisdiction in considering and upholding the fraud penalties set forth in the two FPAAs.

IV

The judgment of the district court is AFFIRMED.

30