NOT DESIGNATED FOR PUBLICATION

No. 118,639

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRET BLEVINS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ERIC WILLIAMS, judge. Opinion filed December 10, 2021.
Reversed and remanded with directions.

*Nicholas David* and *Cooper Overstreet*, of The David Law Office LLC, of Lawrence, for
appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*,
attorney general, for appellee.

Before ARNOLD-BURGER, C.J., MALONE and CLINE, JJ.

PER CURIAM: Bret Blevins and his girlfriend, Tammy Akers, were the only
occupants of a vehicle involved in a fatal car crash. They both drank alcohol and used
methamphetamine before the crash, and each claimed the other was driving. Blevins was
arrested after he left the scene of the accident.

Blevins claims he did not receive effective assistance of counsel at his criminal
jury trial because of his attorney's conflicts of interest. Tammy and her husband paid

Tammy's longtime attorney a flat fee of $30,000 to represent Blevins once criminal charges were filed. This attorney also represented Tammy in another matter while representing Blevins. It does not appear Blevins' attorney investigated Tammy's involvement in the crash. He also did not hire an accident reconstructionist, DNA expert, or medical expert, despite Blevins' requests that he do so. At trial, Blevins' attorney blamed Tammy for the crash, arguing that she was the driver.

A jury convicted Blevins of several crimes arising out of the crash. He appealed his convictions and another panel of this court remanded to the district court for a *Van Cleave* hearing on Blevins' claim of ineffective assistance. See *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986). The district court denied Blevins' claim, finding no conflict and, if a conflict existed, Blevins waived it. Blevins now challenges the district court's findings on remand. We find Blevins' attorney had several conflicts of interest which adversely affected his representation and which Blevins did not waive. We remand the matter with directions for a new trial, with different counsel.

FACTUAL AND PROCEDURAL HISTORY

*The Fatal Car Accident*

Blevins and Tammy were the sole occupants of a Cadillac Escalade which sped through a residential neighborhood, ran a stop sign, and crashed into a van. One of the witnesses to the collision saw Blevins exit through the Escalade window, stumble around acting disoriented, then take off running. That witness followed Blevins and assisted law enforcement in locating him.

Officer Tristan Fellows found Blevins a couple of blocks away, injured and laying on the ground. Blevins smelled strongly of alcohol and had bloodshot eyes. Fellows arrested Blevins and took him back to the scene.

Emergency personnel transported Blevins, Tammy, and the three surviving occupants of the van to the hospital. Two of the van's occupants did not survive the crash. During her ride, Tammy said Blevins was driving. She also stated that she and Blevins fought over the keys, and Blevins had been drinking before the crash. She did not disclose that she had also been drinking and using methamphetamine.

*Collection and Testing of Blevins' Blood Sample*

Officer Fellows accompanied Blevins to the hospital. He read Blevins an implied consent advisory to test Blevins' blood alcohol content. Blevins refused the test, so Detective Michael Amy obtained a search warrant to gather a sample of Blevins' blood. Unaware that the search warrant authorized the seizure of two vials of blood, Detective Amy directed hospital staff to seize three vials of Blevins' blood. Blevins' blood tested positive for methamphetamine and had an alcohol content of around 0.124.

*Pretrial Proceedings*

After the accident, Tammy introduced Blevins to her long-time attorney, Carl Maughan. Tammy and her husband, Greg Akers, paid Maughan a flat fee of $30,000 to represent Blevins. This fee did not cover Maughan's expenses. Blevins first hired Maughan and Maughan's associate attorney to represent him at trial. After that associate left the firm, Maughan became Blevins' sole attorney.

At his preliminary hearing, Blevins argued the State's charges should be dismissed because he claimed Tammy was driving the Escalade when it crashed. The district court denied Blevins' request and bound Blevins over on all charges.

After the preliminary hearing, detectives completed other forensic testing. These tests revealed Tammy's DNA was located on the steering wheel airbag but Blevins' DNA

3

was not. The passenger side airbag had a mixture of two peoples' DNA but Blevins' DNA was excluded, and the results for Tammy's DNA were inconclusive, so she could not be included or excluded as a contributor. Another test showed the driver's side airbag contained the DNA of two individuals on the center of the airbag. Blevins could not be excluded as one of those individuals. Tammy was, however, excluded as a major contributor to that DNA profile.

At a pretrial motion hearing, Maughan told the district court he had represented Tammy before and explained that Tammy introduced him to Blevins for this case. Maughan told the court he had received written waivers from both Blevins and Tammy, which the court instructed Maughan to file. Maughan neglected to file these waivers, and he did not present them for review by the district court.

Before trial, Blevins moved to suppress the results of the blood alcohol and DNA tests. Blevins also moved to suppress Tammy's testimony, claiming she was unqualified to testify about the accident since the evidence suggested she was "highly intoxicated with and under the influence of alcohol and methamphetamines at the time of the events. . . ." He alleged Tammy may have some criminal liability based on her actions and asked the court to provide counsel to advise her on her Fifth Amendment privilege against self-incrimination. When arguing this motion, Maughan stated:

> "[E]ven though I have a waiver and I don't represent her—I have represented her in the past. I felt sort of residual, needed [*sic*] to kind of protect her. At the end of the day, Judge, there were two people in this vehicle, and one of them was driving. . . . [T]here is sufficient concern here for me that she may be sitting on the stand and decide to suddenly invoke, and I wanted to raise that now so that maybe we could address it with her before we had a jury present. Because I think that there is some criminal liability here, even if it is recklessly giving permission to drive the car or aiding and abetting by providing alcohol and maybe methamphetamine."

4

The court denied all three motions to suppress.

*Trial*

At trial, Blevins maintained that Tammy was driving when the crash occurred, and the DNA evidence corroborated that account. Blevins testified he was arguing with Tammy for most of the day. He said they drove Tammy's car, the Escalade, from a friend's house to a Wendy's restaurant to pick up food. After leaving Wendy's, the couple continued fighting, and Tammy eventually threw a ring Blevins bought for her at Blevins. Then, according to Blevins, he pulled over and moved to the backseat of the car to look for the ring, when he suddenly felt the car accelerate and crash. Blevins did not claim he saw Tammy jump into the driver's seat, but he "assum[ed]" she did.

Several witnesses to the crash testified, none of whom saw who was driving the Escalade. One of the witnesses assumed Blevins was the driver, based on where his body landed after the crash. Another witness testified he may have seen a man in the back seat. A third witness provided inconsistent testimony on whether Blevins exited the vehicle out of the passenger or driver's side window.

The State presented surveillance footage from Wendy's, taken shortly before the crash, which Tammy used to identify herself as the passenger of the Escalade. She also testified that Blevins was driving the Escalade when they left Wendy's and that he was driving when the Escalade hit the van.

Maughan cross-examined Tammy at trial over her drug use and drinking before the crash. She admitted she was "high" during the accident. She also admitted her husband Greg would be mad at her if he knew she had been "doing methamphetamines" or had a boyfriend. She denied that Blevins was still her boyfriend, claiming they were just friends at the time of the crash.

5

Maughan called Blevins' probation officer to testify. This testimony was seemingly used to provide context for why Blevins would flee the scene of the crash and refuse a blood test—a positive drug test could jeopardize his probation.

The jury found Blevins guilty on all counts, even those charged in the alternative. The district court imposed a sentence for only the more serious of the alternative charges, including the two counts of second-degree murder and four counts of aggravated battery. The district court ordered Blevins to serve 728 months in prison and 6 months in jail.

*Appellate Proceedings*

Blevins directly appealed and moved for the appointment of appellate counsel. He later moved to stay appellate briefing and remand for a *Van Cleave* hearing in the district court to determine whether he was denied effective assistance of counsel based on Maughan's conflicts of interest. The State first opposed this motion, claiming both Blevins and Tammy waived the conflicts in writing. After this court denied Blevins' motion, the State moved for remand, noting it could not locate Blevins' written waiver and neither could Maughan. This court granted the State's motion.

*Proceedings on Remand*

At the *Van Cleave* hearing, Blevins testified he was incarcerated while his case was pending. He said he originally applied for a public defender, but one never showed up. He explained that his family and friends searched for an attorney to represent him and, two or three weeks after his arrest, Maughan showed up to visit him in jail. Blevins testified Maughan told him that Tammy and her husband had referred Maughan to represent Blevins. Blevins described Tammy as his girlfriend and admitted he was having an affair with her.

6

Blevins said Maughan told him that Maughan had represented Tammy several times in the past, including for speeding tickets, domestic violence, and a DUI case. Blevins denied signing a conflict-of-interest waiver. Blevins instead said Maughan mentioned a potential conflict might exist based on Maughan's prior representations of Tammy, but that Maughan intended to address this conflict with the judge. Blevins did not consult with another attorney about whether it was in his best interests to have Maughan represent him, and he denied that Maughan informed him of his right to do so. Blevins testified he could not afford to pay Maughan's fee.

Maughan testified he obtained written waivers from both Tammy and Blevins. He said Tammy came into the office to sign her waiver. Maughan believed a written waiver was obtained from Blevins before the preliminary hearing, but he was unable to locate a signed copy. He could not remember whether he or his associate discussed the written waiver with Blevins, but he testified it was a "good possibility" his associate did. Maughan attributed his inability to find and file the waiver to poor record keeping, noting he was the only attorney working on Blevins' case at that time.

Although Maughan did not provide a copy of Blevins' signed waiver, he testified he located an unsigned copy in his computer files. Maughan testified he drew up this waiver for Blevins to sign:

IN THE EIGHTEENTH JUDICIAL DISTRICT
DISTRICT COURT, SEDGWICK COUNTY, KANSAS
CRIMAL [*sic*] DEPARTMENT

STATE OF KANSAS,     )
          Plaintiff,   )
vs.     )     Docket No. 16CR1428
     )
BRET[] BLEVINS,     )
          Defendant   )
     )

**WAIVER OF CONFLICT**

"I, Bret[] Blevins, am being represented by the Maughan Law Group in the above captioned case. I am aware that a potential witness in this case, Tammy Akers, is a former client of the Maughan [L]aw [G]roup. I am aware that this creates a potential for a conflict of interests and have been fully apprised of the nature of the potential conflict of interests. Specifically, I am aware that Maughan Law Group has a certain obligation of loyalty to their clients and their former clients. If Ms. Akers's interests and my own interests may be in conflict. [sic] Being fully aware of the nature of this conflict and having been advised that I have a right to seek independent counsel for advice on this matter, I hereby waive any potential conflict of interest arising from the Maughan Law Group's representation of Mr. [sic] Akers and me."

While he did not have a signed waiver from Blevins, Maughan produced a waiver signed by Tammy:

IN THE EIGHTEENTH JUDICIAL DISTRICT
DISTRICT COURT, SEDGWICK COUNTY, KANSAS
CRIMAL [sic] DEPARTMENT

| STATE OF KANSAS, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Docket No. 16CR1428 |
| | ) | |
| BRET[] BLEVINS, | ) | |
| Defendant | ) | |
| | ) | |

**WAIVER OF CONFLICT**

"I, Tammy Akers, am a former client of the Maughan [L]aw [G]roup and a potential witness in the above captioned case. I am aware that the above named defendant is being represented by the Maughan Law Group. I am aware that this creates a potential for a conflict of interests and have been fully apprised of the nature of the potential conflict of interest. Specifically, I have been advised that if I [am] called as a witness in the above captioned case the Maughan Law Group will have an obligation to represent the best interests of the defendant and that the interests of the defendant in this case may conflict with my personal interests. Being fully aware of the nature of this conflict and having been advised that I have a right to seek independent counsel for advice on this matter, I hereby waive any potential conflict of interest arising from the Maughan Law Group's representation of Mr. Blevins and me."

Maughan testified that after Tammy signed her waiver, he did not feel he would be prohibited from pursuing a defense in which Blevins would accuse Tammy of driving the Escalade and thus causing the accident.

8

Despite both written waivers characterizing Tammy as a "former client" of Maughan Law Group, Maughan admitted that either he or his former associate also represented Tammy in a separate traffic matter while Blevins' case was pending. Neither Blevins nor Maughan testified they discussed Maughan's representation of Tammy in this pending matter, nor was any evidence presented at the hearing on exactly when and for how long Maughan or his former associate represented both Tammy and Blevins.

Both Maughan and Blevins testified about their discussions on Tammy's involvement in the case. Maughan said he had hoped Tammy would invoke her Fifth Amendment right under the United States Constitution not to testify at trial. According to Blevins, Maughan planned to speak with Tammy and Greg about the matter and see if he could get his friend from law school to represent Tammy for that limited purpose. Blevins understood Tammy would "plead the fifth" and "that was going to put reasonable doubt in the jurors' mind."

Blevins said Maughan did not discuss Tammy's role in the case as a witness or victim, presumably if she were to testify. Maughan testified that he discussed his conflicts with Blevins several times, even in the midst of trial when Tammy took the stand. Maughan said he wanted to ensure Blevins was comfortable with Maughan "going after [Tammy] on the stand, and basically trying to suggest or create reasonable doubt by suggesting she was the driver or had something to do with this." Maughan explained that he believed Tammy was "a potentially contributing factor or accessory to the crime." He also felt that if the jury did not believe Blevins was driving, "the only other possibility was that Tammy was driving." Maughan said when Tammy signed the conflict waiver, he explained to her that since he would be representing Blevins, he may have to "point the finger at her." He said he was more concerned about how Blevins would react if he had to point the finger at someone whom Blevins cared for rather than going after the person who had paid his fee.

9

Blevins claimed that he wanted Maughan to hire an investigator to assist in his case—and that he offered to pay the costs—but Maughan would not cooperate. According to Blevins, Maughan told him that he and his former associate had driven by the scene of the accident instead. Blevins also testified he wanted to hire a "head injury expert," because he claimed he had no memory of the accident. He claimed he wrote Maughan letters expressing his desire to engage an investigator and expert witness, and his brother also talked to Maughan about it. Maughan admitted they discussed getting an accident reconstructionist and a DNA expert, but Maughan decided that would not make much of a difference, given the number of witnesses, statements, and physical evidence. Maughan maintained the decision not to hire experts and a reconstructionist had nothing "to do with who was paying the bill."

Maughan did hire an investigator for purposes of "serving some people and . . . basically getting some statements from some individuals who may have been relevant to the case." No evidence was presented on whether this investigator interviewed Tammy about the accident.

Blevins also accused Maughan of not pursuing plea negotiations after he declined a plea offer from the State. Blevins testified he told Maughan he was willing to serve 8 to 10 years in prison. But Blevins claimed he was unaware that Maughan could present the State with that offer, and Maughan never explained the plea negotiation process to him. Maughan admitted Blevins offered what he believed would be a fair number of years to serve, and he testified he would have made a counteroffer along those lines. Still, the State was unwilling to come down to the number Blevins offered, and Maughan's recollection was that the negotiation "was not going anywhere."

The district court determined Blevins had not met his burden to show ineffective assistance of counsel. While the district court judge acknowledged he was not the same

judge who presided over the trial, he noted he could determine the matter based on the evidence presented at the *Van Cleave* hearing.

The district court found Maughan's representation of Tammy in a separate traffic violation was not a concurrent conflict of interest because (1) Blevins failed to show either a likelihood that his attorney's performance would have been different without a conflict of interest or a plausible alternative defense strategy that was objectively reasonable, (2) Blevins did not establish that Maughan's representation of Tammy in an unrelated traffic case was directly adverse to his representation of Blevins, and (3) Blevins failed to establish a substantial risk that Maughan's representation of Blevins was materially limited by his responsibilities to Tammy in an unrelated traffic case.

As for the potential conflict arising from Tammy and Greg's payment of Blevins' legal fees, the district court found Blevins and Tammy "freely, knowingly, and voluntarily waived, both orally and in writing, the conflict after being adequately informed." The court also noted Maughan "obtained conflict of interest waivers from both [Tammy] and [Blevins] consistent with the Kansas Rules of Professional Conduct 1.7." Alternatively, the court found that even if Blevins did not waive the conflict, he did not adequately show it had an adverse effect on his representation and thus the fee did not create a conflict of interest. The court also found the fee arrangement was reasonable and not prohibited by Kansas Rule of Professional Conduct (KRPC) 1.5 (2021 Kan. S. Ct. R. 327).

ANALYSIS

Blevins appeals the *Van Cleave* court's finding that he received effective assistance of counsel. He claims multiple conflicts of interest impaired Maughan's representation, including conflicts created by (1) Maughan's concurrent representation of both Tammy and Blevins, (2) Tammy and Greg's payment of Blevins' legal fees, and (3)

11

Maughan's flat-fee arrangement. Blevins also raises several trial errors, of which we need only address one (relating to his motion to suppress the blood samples), since we are remanding the matter for a new trial.

*Ineffective Assistance Claim*

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel. Ineffective assistance of counsel claims may stem from deficient performance or conflict of interest. *State v. Stovall*, 298 Kan. 362, 386, 312 P.3d 1271 (2013) (Biles, J., dissenting in part and concurring in part). To establish a claim based on deficient performance, a defendant must prove: (1) counsel's performance was constitutionally deficient and (2) the deficient performance prejudiced the defense, meaning there is a reasonable probability the result would have been different but for counsel's errors. *State v. McDaniel*, 306 Kan. 595, 607, 395 P.3d 429 (2017).

An ineffective assistance of counsel claim based on a conflict of interest is "'more nuanced.'" *State v. Moyer*, 309 Kan. 268, 278, 434 P.3d 829, *cert. denied* 140 S. Ct. 135 (2019). In that instance, a defendant must first "'establish that his or her attorney had an active conflict of interest.'" *Moyer*, 309 Kan. at 279. If, as here, the defendant did not object to the conflict before the district court, then the defendant must establish "the conflict of interest adversely affected his attorney's performance." *State v. Jenkins*, 257 Kan. 1074, 1081, 898 P.2d 1121 (1995). Once an active conflict and an adverse effect are shown, prejudice is presumed. 257 Kan. at 1084. This is because when counsel is burdened by an actual conflict of interest, "counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland v. Washington*, 466 U.S. 668, 692, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 345-50, 100 S. Ct 1708, 64 L. Ed. 2d 333 [1980]).

Ineffective assistance of counsel claims—whether based on deficient performance or conflict of interest—involve mixed questions of fact and law. Thus, we review the *Van Cleave* court's underlying factual findings for support by substantial competent evidence and its legal conclusions based on those facts de novo. *State v. Cheatham*, 296 Kan. 417, 430, 292 P.3d 318 (2013).

As mentioned above, Blevins alleges Maughan had three conflicts of interest that rendered Maughan's representation ineffective. Blevins maintains he was not properly informed of Maughan's conflicts, and he did not waive those conflicts in writing. Alternatively, Blevins contends the unsigned waiver Maughan presented at the *Van Cleave* hearing was deficient.

Blevins claims Maughan's conflicts adversely affected his representation in several ways. First, Blevins contends the conflicts created by Maughan's past and concurrent representation of Tammy affected Maughan's ability to "fully" and "effectively" impeach Tammy's trial testimony and "thoroughly investigate her role in the accident." And Blevins questioned Maughn at the *Van Cleave* hearing regarding whether the flat-fee arrangement affected Maughan's decisions to forgo hiring a DNA expert and accident reconstructionist. He also argues this fee arrangement caused Maughan to (1) "provide a less than zealous defense," (2) purposefully increase the case longevity by ignoring Blevins' requests to seek a plea agreement, and (3) encourage Blevins to move forward with a preliminary hearing despite the possibility of more serious charges being filed. Blevins further contends that reversal is required under the cumulative error doctrine because the record shows the "cumulative nature" of Maughan's conflicts establishes a violation of Blevins' constitutional right to effective assistance of counsel.

13

*Conflicts Created by Concurrent Representations*

As noted above, the *Van Cleave* court found Maughan's concurrent representation of Blevins and Tammy (in her unrelated traffic matter) did not create a conflict of interest under KRPC 1.7 (2021 Kan. S. Ct. R. 336). This rule prohibits representation of clients where the "representation involves a concurrent conflict of interest." KRPC 1.7(a) (2021 Kan. S. Ct. R. 336). A concurrent conflict of interest exists if

"(1)  the representation of one client will be directly adverse to another client; or

"(2)  there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." KRPC 1.7(a) (2021 Kan. S. Ct. R. 336).

Despite the existence of a concurrent conflict of interest, KRPC 1.7 allows an attorney to represent a client under these exceptions:

"(1)  [T]he lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

"(2)  the representation is not prohibited by law;

"(3)  the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

"(4)  each affected client gives informed consent, confirmed in writing." KRPC 1.7(b) (2021 Kan. S. Ct. R. 336).

The overarching problem with the *Van Cleave* court's factual findings is its analysis was incomplete. The *Van Cleave* court only addressed Maughan's concurrent representation of Tammy in an unrelated traffic matter; it did not acknowledge his past recurrent representation, nor did it address the divergent interests of Blevins and Tammy

14

in this action. While it may be true that Maughan's representation of Tammy in an unrelated traffic matter did not create a conflict, these other circumstances did.

As Blevins aptly notes, Tammy was not merely an uninterested bystander witness. If Blevins was not driving the car, she was. She had every incentive for the State to prosecute Blevins for the accident and for the jury to convict him. Tammy was the key witness and a potential suspect, whom Maughan had represented for many years and in several cases. She was also the one paying his bill.

When Maughan took on Blevins as a client, he owed him the same duties of loyalty and care that he already owed to Tammy, as both a former and current client. And when he agreed to represent Blevins, he knew Blevins' and Tammy's legal positions were at dramatic odds. A lawyer cannot jointly represent two criminal codefendants with inconsistent defenses. *In re Johnson*, 294 Kan. 575, 585, 276 P.3d 213 (2012) (citing *State v. Aguilar*, 290 Kan. 506, 513-15, 231 P.3d 563 [2010]). This situation stopped just short of that prohibited scenario. While Tammy was not a codefendant, Maughan acted like she should become one. Maughan presented a theory of defense which directly inculpated his former and current client, thereby making his representation of Blevins directly adverse to Tammy. See KRPC 1.7(a)(1).

We also cannot say the predicament Maughan entered did not objectively create a substantial risk that his representation of Blevins would be materially limited by his responsibilities to Tammy. See KRPC 1.7(a)(2). Even Maughan acknowledged Tammy's divergent interest in Blevins' case and Maughan's continuing legal and ethical duty to protect Tammy and her confidences meant he could not represent Blevins without conflict waivers from both Blevins and Tammy. Tammy's payment of Maughan's fee raises even more questions about which master Maughan felt bound to serve.

15

Maughan admitted he actively felt a continuing sense of obligation to Tammy (even after execution of the written waivers) when he tried to prevent Tammy from incriminating herself by seeking to suppress her statements. Blevins also testified Maughan discussed with him a strategy by which Maughan would seek to secure an attorney for Tammy to encourage her to invoke her Fifth Amendment privilege against self-incrimination. Our Supreme Court has acknowledged "the perils of trying to serve two masters," which is "literally as old as the Bible." *Stovall*, 298 Kan. at 374 (quoting Matthew 6:24: "'No one can serve two masters. Either you will hate the one and love the other, or you will be devoted to the one and despise the other.'"). As in *Stovall*, Maughan was called on to zealously represent Blevins while protecting the interests and confidences of his former (and current) client, Tammy. See 298 Kan. at 374.

It is not hard to imagine the significant risk of conflicting pressures upon an attorney when representing both a longtime client who is not only paying his bill but also implicated in the very crime with which his new client is charged, along with a new client whose only defense is to incriminate the attorney's former client. This situation falls squarely within KRPC 1.7's definition of concurrent representation.

*Waiver of Conflicts*

On appeal, Blevins argues he did not sign the written waiver Maughan produced at the *Van Cleave* hearing, and the State argues we must not disturb the *Van Cleave* court's factual finding that he did. We find this dispute beside the point. On its face, Blevins' written waiver is insufficient.

We have held that "to waive the right to conflict-free counsel, a defendant's 'waiver must be knowing, voluntary, and done with an awareness of relevant circumstances and likely consequences.'" *State v. Jackson*, 52 Kan. App. 2d 125, 137, 363 P.3d 408 (2015) (quoting *State v. Bowen*, 27 Kan. App. 2d 122, 129, 999 P.2d 286

16

[2000]). Blevins' written waiver does not meet this standard since it did not address all the relevant circumstances and likely consequences. The written waiver only describes Tammy as a "potential witness" and "former" client and simply acknowledges Maughan's firm "has a certain obligation of loyalty to their clients and their former clients. If Ms. Akers's interests and my own interests may be in conflict [*sic*]." It does not mention Maughan's concurrent representation of Tammy, Tammy's payment of Blevins' legal fees, Tammy's antagonistic interest in the case, or explain how any of these conflicts impact Maughan's representation of Blevins.

While the State argues oral conversations between Maughan and Blevins supplemented the written waiver, our Supreme Court has repeatedly held simple oral statements cannot satisfy the waiver requirements. *Boldridge v. State*, 289 Kan. 618, 626, 215 P.3d 585 (2009) (noting statements on the record by the court and the parties can substitute for the writing required by the KRPC but an oral statement by a defendant accepting counsel's appointment, without more, does not satisfy the waiver requirements); see *Jackson*, 52 Kan. App. 2d at 138.

Further, like in *Jackson*, the record is void of evidence about these alleged oral disclosures. For example, no one testified Blevins was told Maughan concurrently represented Tammy. No one testified Tammy waived her attorney-client privilege, nor did her written waiver address this issue. No one testified that Maughan (or his associate) discussed with Blevins how Maughan's prior or concurrent representation of Tammy could impact Maughan's representation of Blevins, including his investigation and cross-examination of her. Instead, Maughan said he hoped Tammy would not testify and Blevins understood Maughan would encourage her not to, even going so far as to try to obtain separate counsel to encourage her to invoke her Fifth Amendment privilege.

Considering the seriousness of the charges, and the multiple conflicts of interest, a clear and detailed waiver was necessary. We agree with Blevins that the waiver offered

17

by Maughan at the *Van Cleave* hearing falls woefully short of this requirement. Because Blevins' waiver was not made knowingly or with an awareness of the relevant circumstances or likely consequences, Blevins did not waive his right to a conflict-free attorney. *Jackson*, 52 Kan. App. 2d at 138-39. Based on the record before us, we cannot find Blevins was informed and aware of the risks associated with Maughan's representation, nor can we find Tammy's waiver sufficiently freed Maughan to provide conflict-free representation to Blevins.

*Adverse Effect*

Despite Maughan's conflicts of interest, Blevins must still show Maughan's conflicts "affected the adequacy of [his] representation." *Moyer*, 309 Kan. at 282; see also *United States v. Flood*, 713 F.3d 1281, 1286 (10th Cir. 2013) (applying *Cuyler*'s adverse effect standard and presumption of prejudice to third-party payment, conflict of interest claim); *Stovall*, 298 Kan. at 376-78 (applying *Cuyler* standard in successive representation claim); *Cheatham*, 296 Kan. at 447-55 (applying *Cuyler* standard in conflict of interest claim based on flat-fee agreement). Some courts overtly require a defendant "point to 'specific instances in the record to suggest an actual conflict or impairment of [his or her] interests'" to meet this standard. *United States v. Burney*, 756 F.2d 787, 792 (10th Cir. 1985) (citing *United States v. Mers*, 701 F.2d 1321, 1328 [11th Cir. 1983]). In a somewhat different context, our Supreme Court in *Stovall* found it unnecessary to require such a specific showing in all cases:

> "Perhaps the panel was looking for a recitation of more specific things that counsel did or did not do during the trial that were the result of one or more of the conflicts and that had an adverse effect on the defendant. Such a requirement may be asking too much. Recently, in *State v. Galaviz*, 296 Kan. 168, 183, 291 P.3d 62 (2012), we discussed the potential difficulty one can encounter in trying to identify the precise adverse effect that has resulted from a conflict of interest:

18

"'[C]ounsel's conflicting obligations to multiple defendants 'effectively sea[ls] his lips on crucial matters' and make[s] it difficult to measure the precise harm arising from counsel's errors." Also, "[j]oint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing." The record in joint representation cases will ordinarily not memorialize mistakes of omission as it does affirmative instances of trial error, so for a court to evaluate the existence and effect of such mistakes of omission would entail "unguided speculation." [Citations Omitted.]'

"Although the *Galaviz* discussion was in conjunction with a scenario that warrants a presumption of prejudice, the concepts are equally applicable to our scenario in which defense counsel was called upon to zealously represent Stovall while protecting the interests and the confidences of her former client . . . ." 298 Kan. at 374.

After reviewing the appellate record, the *Stovall* court found a conflict of interest existed where defense counsel in a sexual abuse of a child case previously represented a potential witness who was the victim's uncle and who had been convicted of a similar offense. Although the defendant did not cite specific instances, the record suggested "that Stovall's counsel would be constrained from implicating [the former client] as the abuser." 298 Kan. at 373-74. The *Stovall* court found this conflict eliminated a potential defense strategy and assumed an adverse effect occurred based on the nature of circumstances presented: "The inability of defense counsel to serve the interests of both Stovall and [the former client] necessarily affected the adequacy of her representation of Stovall." 298 Kan. at 374.

Blevins argues Maughan could not effectively impeach Tammy's testimony because of his divided loyalties. Although Maughan seemingly tried to do exactly that, even a cross-examination that might appear "vigorous" does not necessarily expunge the taint of conflicting representation. Once again, this is because "'representation of conflicting interests is suspect because of what it tends to prevent the attorney from

doing.'" *Church v. Sullivan*, 942 F.2d 1501, 1512 (10th Cir. 1991) (quoting *Holloway v. Arkansas*, 435 U.S. 475, 489-90, 98 S. Ct. 1173, 55 L. Ed. 2d 426 [1978]).

We do not know what questions, if any, Maughan did not ask Tammy at trial, nor do we know what fact witnesses, if any, he did not pursue. We do note, however, that Maughan did not testify that his investigator interviewed Tammy about her involvement in the crash. See *People v. DiPippo*, 82 A.D.3d 789, 791, 19 N.Y.S. 2d 136 (N.Y. App. Div. 2011) (trial counsel found ineffective where, "among other things, trial counsel did not conduct even a minimal investigation into [his former client] by sending an investigator to ascertain [the former client's] possible involvement" in crimes charged against defendant). And even assuming Maughan himself did, given their previous—and potentially ongoing—attorney-client relationship, Maughan could not likely disclose the information revealed from such an interview.

Maughan's representation hinged on him serving two masters whose interests were clearly adverse to each other. *Jackson*, 52 Kan. App. 2d at 142-43. He actively sought to shield both Tammy and Blevins from criminal liability when he tried to exclude Tammy's testimony based on her Fifth Amendment privilege (by encouraging her to invoke the privilege, seeking to suppress her testimony, or both) while defending Blevins for the same crime. And Maughan admitted he declined to retain the experts Blevins requested— including an accident reconstructionist and DNA expert—both of whom may have bolstered Blevins' version of events and impeached Tammy's. Blevins also asked Maughan to retain a "head injury" expert, since he had no memory of the accident. Such evidence could have avoided the admission of the damaging evidence that Blevins was on probation (which Maughan used to explain why Blevins may have fled the scene and refused a blood test).

Given Maughan's numerous conflicts, we cannot say with confidence that these conflicts did not impact the decisions he made in his representations of Blevins. Under

20

these circumstances, the *Van Cleave* court's finding that Maughan's divided loyalties did not adversely affect his representation of Blevins was unreasonable and not supported by substantial competent evidence.

*Conflict Created by Fee Arrangement*

Blevins also alleges the flat-fee structure of Maughan's fee arrangement created a conflict of interest and adversely affected Maughan's representation in several ways: (1) it disincentivized Maughan to negotiate a plea (since Maughan testified at the *Van Cleave* hearing he would have refunded a "big chunk" of the fees upon early negotiation of a plea); (2) it encouraged Maughan to move forward with a preliminary hearing despite the possibility of more serious charges being filed (once again, discouraging early resolution); and (3) it discouraged Maughan from expending more than minimal effort to defend Blevins.

Our Supreme Court considered whether a flat-fee structure created a conflict of interest that adversely affected counsel's representation in *Cheatham*. Following the test applied in *Cheatham*, we examine: (1) what type of fee agreement the parties entered; (2) whether the fee arrangement created a conflict of interest; and (3) whether that conflict adversely affected counsel's performance. 296 Kan. at 448.

*Type of Fee Agreement*

While the record includes no copy of Maughan's fee agreement, Maughan testified he represented Blevins for a "a flat fee earned immediately." Blevins understood Maughan offered to represent him for a flat fee of $30,000 or $20,000 plus an hourly rate, and Greg chose and paid the flat fee. Maughan also testified Greg paid the $30,000 fee by check. Maughan testified this fee did not include expenses, such as an accident reconstructionist or a DNA expert. So we consider whether a flat-fee arrangement (which

21

did not cover expenses) created a conflict which adversely affected Maughan's representation.

*Potential Conflict of Interest and Adverse Effect on Performance*

*Cheatham* analyzed the potential conflicts of interest a flat-fee arrangement can create, which include, as Blevins asserts here, a financial disincentive for the attorney to fully investigate or prepare a defense. 296 Kan. at 455. In *Cheatham*, the court noted the defense attorney spent a mere 200 hours on Cheatham's death penalty case, 60 of which were spent in trial. The court found this number "appallingly low" and "stunning." 296 Kan. at 454. It also found defense counsel failed to retain an investigator or to assemble a defense team to adequately present Cheatham's case based on an unwillingness to invest the resources this would take. As a result, the court found potential defense witnesses were never interviewed and possible leads were never pursued. Thus, the court found the conflict of interest created by Cheatham's flat-fee arrangement adversely affected his attorney's representation.

When applying the *Cheatham* test to the facts before us, we do not find Maughan's flat-fee arrangement created a conflict with or adversely affected the plea negotiations. While Blevins testified he asked Maughan to pursue a deal closer to 8 to 10 years' imprisonment, he did not say he was willing to negotiate for a deal that included more prison time. Maughan testified the State was not willing to reduce its plea offer to the 8 to 10 years which Blevins was willing to serve. Blevins points to nothing Maughan could or should have done to negotiate a plea which Blevins was willing to accept.

We also do not find that the flat-fee arrangement conflicted or adversely affected the decision to proceed with a preliminary hearing. The record shows Blevins made an informed decision on this issue. Blevins testified Maughan notified him of his right to waive the preliminary hearing and the potential ramifications of proceeding. Blevins said

22

Maughan discussed with him the potential that the State could amend its complaint to add more serious charges if he proceeded to the preliminary hearing. He also said Maughan told him if he waived the preliminary hearing, the State could not add those charges. Blevins testified Maughan advised proceeding with the preliminary hearing so they could "hear what the DA had." And Maughan testified that, in this type of case, a preliminary hearing is probably advisable, evidencing his decision to proceed reflected his usual practice for this type of case, not the fee arrangement.

Even so, we find Blevins makes a persuasive argument that, like in *Cheatham*, the flat-fee arrangement conflicted and adversely affected Maughan's legal strategy in other ways. While the record does not reflect that Maughan expended an insufficient amount of time on Blevins' case, it does reflect that Maughan's flat-fee structure created a disincentive for Maughan to pursue potential leads or retain expert witnesses to support Blevins' defense. Maughan admitted his flat fee did not cover the use of an accident reconstructionist or a DNA expert. Maughan also admitted he and Blevins discussed hiring these experts, but Maughan decided not to. Given the vacillating testimony from the witnesses to the crash, and the DNA evidence which potentially implicated Tammy, these experts could have provided valuable testimony to support Blevins' defense that Tammy was driving.

Last, the record does not show that Maughan investigated the State's key witness (and the other potential suspect): Tammy. While this inaction could have been related to his past and concurrent representation of Tammy (as discussed above), it is equally true that his flat-fee structure did not encourage him to pursue additional leads, like in *Cheatham*.

*Waiver of Conflict Arising from Fee Arrangement*

Besides finding Tammy and Greg's payment of Blevins' legal fees did not amount to a conflict, the district court also found Blevins and Tammy "freely, knowingly, and voluntarily waived, both orally and in writing, the conflict after being adequately informed." Yet neither written waiver mentioned the fee arrangement. In fact, we see no evidence in the record that Blevins (or Tammy, for that matter) waived any conflict created by the fee arrangement (either the flat-fee structure or the conflict created by Tammy and Greg's payment) in writing.

The failure of either written waiver to mention the fee arrangement is significant because, under KRPC 1.8 (2021 Kan. S. Ct. R. 345), Blevins had to waive the conflict created by Tammy and Greg's payment of his legal fees in writing. While the *Van Cleave* court analyzed the fee agreement under KRPC 1.5 (finding it to be reasonable), KRPC 1.8 is also implicated. This rule prohibits a lawyer from accepting compensation for representing a client from one other than the client unless

"(1) the client gives informed consent;

"(2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and

"(3) information relating to representation of a client is protected as required by Rule 1.6 [confidentiality of information]." KRPC 1.8(f) (2021 Kan. S. Ct. R. 346).

The comments to this rule note that if the fee arrangement creates a conflict of interest for the lawyer, then the lawyer must also comply with KRPC 1.7 (concurrent conflict of interest). When there is a concurrent conflict of interest (as here), the informed consent must be confirmed in writing. KRPC 1.8, cmt. [12]; KRPC 1.7(b).

Under these circumstances, the *Van Cleave* court erred in finding Maughan's flat-fee structure did not create a conflict, that Blevins waived this conflict, and that this

24

conflict did not adversely affect Maughan's representation of Blevins. Given our decision to reverse Blevins' convictions based on his specific conflict claims, we need not consider his argument that the cumulative effect of Maughan's conflicts denied him a fair trial.

*Blood Alcohol Evidence*

Blevins argues the district court should have suppressed the results of his blood alcohol tests because police exceeded the scope of the search warrant by obtaining more vials of blood than listed in the warrant. Since we presume the State will seek to introduce this evidence upon retrial, we address Blevins' argument.

We review the factual underpinnings of a district court's decision on a motion to suppress evidence for substantial competent evidence, and we review its ultimate legal conclusion de novo. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014). When—as here—the material facts are not in dispute, whether evidence should be suppressed is a question of law over which our review is unlimited. *State v. Stevenson*, 299 Kan. 53, 57-58, 321 P.3d 754 (2014). Although a defendant initiates a constitutional challenge to a search or seizure by moving to suppress the evidence in question, the State has the burden to prove any challenged police conduct was permissible. *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016).

The Fourth Amendment to the United States Constitution requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

> "'To satisfy the specificity requirement of the constitutions the search warrant must describe the premises to be searched with sufficient particularity to permit the executing officer to locate the same from the face of the warrant. [Citations omitted.]' [*State v.*] *LeFort*, 248 Kan. [332], 334-35[, 806 P.2d 986 (1991)]; see also *Steele v. United States No. 1*, 267 U.S. 498, 503, 45 S. Ct. 414, 69 L. Ed. 757 (1925) ('It is enough

25

if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended.'). 'The purpose of this requirement is to prevent general searches and to prevent the seizure of an item at the discretion of the officer. [Citations omitted.]' *LeFort*, 248 Kan. at 337. 'If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more.' *Horton v. California*, 496 U.S. 128, 140, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990)." *State v. Patterson*, 304 Kan. 272, 275, 371 P.3d 893 (2016).

When law enforcement officers grossly exceed the scope of a search warrant in seizing physical evidence, they undermine the Fourth Amendment's particularity requirement. Such action transforms a valid warrant into a general warrant, thereby requiring suppression of all evidence seized under that warrant. *United States v. Medlin*, 842 F.2d 1194, 1199 (10th Cir. 1988). Unless there is a flagrant disregard for the terms of the warrant, only the improperly seized evidence, rather than all the evidence, will be suppressed. *State v. Kleypas*, 272 Kan. 894, 930, 40 P.3d 139 (2001).

Blevins does not challenge the sufficiency or particularity of the search warrant issued. Instead, he claims the officers who executed the warrant "flagrant[ly] disregard[ed] . . . the terms of the warrant" and "grossly exceed[ed]" its scope. We are unpersuaded on the record before us.

The search warrant allowed officers to collect two vials of Blevins' blood. They collected three. Detective Amy admitted his mistake in instructing medical staff, noting he did not know the warrant only allowed for the collection of two vials. Amy also explained his good-faith basis for the mistake: that in his nearly decade worth of experience with these types of accidents, he understood that three vials should be collected to assess whether a person's alcohol content is rising or falling. Another officer who helped collect the blood samples—Nathan Peterson—also testified that standard

26

procedure typically required three vials. He likewise justified why three vials should be collected when investigating DUI collisions.

What is more, although Detective Amy admitted to not reading the entire warrant, he explained that this was the first time he used a new warrant application. Before using the new application process—which allows police to simply "check the box" necessary to make a request for a warrant—Amy drafted his applications from scratch.

These circumstances do not justify exclusion. The officers did not grossly exceed the search warrant. And Blevins does not point to police conduct requiring deterrence. See *State v. Baker*, 306 Kan. 585, 590, 395 P.3d 422 (2017) ("The exclusionary rule is a judicially created remedy that prohibits the introduction of evidence obtained in violation of the Fourth Amendment to deter future violations."). Moreover, even though the officers exceeded the scope of the warrant by one vial, the State only admitted evidence derived from the first two vials at trial. We find no error in the district court's admission of this evidence at trial.

CONCLUSION

The "essential aim" of the Sixth Amendment "is to guarantee an effective advocate for each criminal defendant." *United States v. Evanson*, 584 F.3d 904, 909 (10th Cir. 2009). Courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them. Otherwise, we jeopardize not only the interests of a criminal defendant, but also the institutional interest in the rendition of just verdicts. *Wheat v. United States*, 486 U.S. 153, 160, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988).

Based on the record before us, we question whether Maughan's conflicted representation produced a just result. Because we find Maughan had an actual conflict of

27

interest (which Blevins did not waive) that adversely affected Maughan's representation, Blevins' convictions must be reversed, and we remand for a new trial with different counsel.

Reversed and remanded with directions.